**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

KRIS SEALS,

     *Plaintiff*,                CASE NO. 1:14-CV-13423

*v.*

LIBERTY LIFE ASSURANCE     DISTRICT JUDGE THOMAS L. LUDINGTON
COMPANY OF BOSTON,         MAGISTRATE JUDGE PATRICIA T. MORRIS


     *Defendant*.

_____/


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.    Recommendation

Plaintiff Kris Seals brings this action for long-term disability benefits against Defendant Liberty Life Assurance Company of Boston ("Liberty") under the civil enforcement provision of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Both sides have moved for judgment on the record. (Docs. 12, 13.) The parties have fully briefed their motions and the case is now ready for Report and Recommendation, pursuant to E.D. Michigan Local Rule 7.1(f)(1). Because the evidence fails to show Seals was disabled under Liberty's Policy, I recommend DENYING his motion for judgment (Doc. 13) and GRANTING Liberty's. (Doc. 12).

### II.    Background

#### a.    ERISA

Concerned about the "growth in size, scope, and numbers of employee benefit plans," Congress passed ERISA in 1974 to ensure uniformity and stability in this rapidly changing field

1

and to protect the interests of participants and beneficiaries of these plans. 29 U.S.C. § 1001; *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Among other things, ERISA regulates employee welfare benefit plans operated through insurance which provides payments in the event of disability. 29 U.S.C. § 1002(1); *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 604 (6th Cir. 2009). Participants are employees or former employees who are or may become eligible to receive benefits under the plan. 29 U.S.C. § 1002(7). Beneficiaries, in turn, are persons "designated by a participant, or by the terms of an employee benefit plan, who [are] or may become entitled to a benefit thereunder." *Id.* § 1002(8).

At issue here is ERISA's civil enforcement provision allowing a plan beneficiary to bring an action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Id.* § 1132(a)(1)(B). This "straightforward" provision lets beneficiaries bring suit for any benefits he believes have been wrongly withheld. *Davila*, 542 U.S. at 210. ERISA does not, however, establish whether a beneficiary is entitled to disability benefits—eligibility is determined by the Plan. *Cleveland v. Liberty Life Assur. Co. of Boston*, No. 06-137080, 2009 WL 649893, at *2 (E.D. Mich. Mar. 10, 2009) (adopting Report & Recommendation). Nonetheless, claims for benefits must receive a "full and fair review" and participants are entitled to "specific reasons" for denial. 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1; *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003); *Curry v. Eaton Corp.*, 400 F. App'x 51, 59 (6th Cir. 2010).

### b.   Factual Background

Seals began working at Dow Chemical ("Dow") in 2000 as a senior sales representative and in 2010 became a Marketing Manager. (Doc. 10 at 661-62.)[1] As a Marketing Manager,

---

[1] All citations to page numbers in the record refer to the CM/ECF electronic "Pg ID" numbering system rather than the "LL" internal pagination.

Plaintiff's job centered on mental and communicative tasks: He crafted and implemented market strategies, developed product launch plans, helped draft sales literature, created presentations, assisted in expanding the customer base, and interacted with various departments throughout all of his duties. (*Id.* at 619.) According to the job description, travel was expected to account for a quarter of his work time. (*Id.*) Defendant characterizes the position's physical demands as sedentary (Doc. 17 at 10), which is largely confirmed by the job description. (Doc. 10 at 619.) Liberty issued Dow's Groups Disability Income Policy ("Policy"), under which it would pay long-term disability benefits to qualifying employees. (*Id.* at 29.) As a Dow employee, Seals was covered by the Policy. (*Id.* at 79; Doc. 17 at 2.)

   1.    *The Policy*

The Policy sets out a tiered process for determining eligibility for long-term benefits, including an initial phase called the "Elimination Period" and an immediately succeeding 24-month period. (Doc. 10 at 35-36.) No benefits are payable during the "Elimination Period," which begins on the day of disability and runs through one of two prescribed periods. (*Id.* at 32, 36.) Throughout both the "Elimination Period" and the next 24 months, the claimant must meet the Policy's definition of disability: The claimant's condition renders him "unable to perform the Material and Substantial Duties of his regular occupation or any other occupation with the company for which the [claimant] is qualified and which is offered at not less than [his] current rate of pay." (*Id.* at 35.)

Liberty will begin payments, after the "Elimination Period," when it receives proof that the claimant is disabled. (*Id.* at 46.) The Policy provides a definition for proof:

   "Proof" means the evidence in support of a claim for benefits and includes, but
   is not limited to, the following:

3

1.      a claim form completed and signed (or otherwise formally submitted) by the [claimant] claiming benefits;

2.      an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and

3.      the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

(*Id.* at 38.)

### 2.      *Car Accident and Initial Medical Evidence*

The medical records stretch back to June 2001, when Seals was struck by a car while riding his motorcycle. (*Id.* at 250.) He spent three days in the hospital, but the initial CAT scan was negative and, aside from his ankle, he had no other fractures. (*Id.* at 245, 250) Nonetheless, his doctor wanted to rule out possible head injuries and ordered continued testing. (*Id.*) While there were no immediate findings of neurological damage, over the next few months his face began to hurt, and he exhibited symptoms of trigeminal neuralgia. (*Id.* at 247-48.) Additionally, he claimed his speech was affected, he suffered back pain, and had insomnia. (*Id.* at 238.) He was cleared to return to work,[2] "but at work he finds himself from time to time not really mentally with it" (*id.* at 247), and even his colleagues had noticed his confused state. (*Id.* at 257.) The doctor also observed his confusion and concluded that he had a closed head injury, post concussive syndrome. (*Id.*) Notes from the following few years, which are mostly illegible, suggest he continued seeking treatment for his closed head injury, at least through the beginning of 2004. (*Id.* at 220-32.)

A second accident, precipitating his present claim for benefits, occurred in April 2012 and resulted in a right-wrist fracture, a closed head injury, and pain in his neck and back. (*Id.* at

---

[2] A few notes indicate he could return only part-time and with physical restrictions (*id.* at 235, 265-66), and a later note suggests he left work again in October. (*Id.* at 264.)

148-49.) Though the record is somewhat unclear, Seals seems to have returned to work sometime in early July and left for good in September. (Doc. 10 at 141, 148-49; Doc. 12 at 2; Doc. 13 at 9.) Apparently, before his accident he was preparing to interview for a new job and in May, while he was still off work, inquired about going forward with the interview. (Doc. 10 at 147.) The nurse suggested he should wait, in light of his meandering thought processes and difficulties communicating after his accident. (*Id.* at 144, 147.) In June, a doctor's note confirmed he would remain off work indefinitely, but allowed him to participate in job interviews. (*Id.* at 141.)

Later that month, Seals received permission from Dr. Babu Nahata that he could return to desk work despite persistent memory deficits. (*Id.* at 137.) However, another doctor, Amanda Schafer, recommended he remain out of the office until the end of June, at which time his testing would be complete. (*Id.* at 135.) By July he was finally cleared to return to his full duties. (*Id.* at 131, 134.) During the final examination before he began working, the nurse noted no speech deficits, ambulatory difficulties, or range of motion deficits in his wrist, and Seals answered questions "quickly and appropriately." (*Id.* at 129.) Seals believed that the coping mechanisms he learned after his 2001 accident to help him "remember tasks" could be used again. (*Id.*)

A note from August reports that Seals felt he was continuing to "make progress" at work. (*Id.* at 125.) But by the next month his back pain increased, becoming so intense that he visited the emergency room, where he was given pain medication. (*Id.*) At a September visit to nurse Jennifer Morris—one of Dow's medical care providers and Seals's case manager—he reported that the medications caused drowsiness but he was still working and driving. (*Id.* at 66, 124, 298-99, 314; Doc. 13 at 9.) At work, his desk adjusted so that he could either sit or stand at it, and he also took stretch breaks and could visit the nurse's office to lie down or ice his back. (Doc. 10 at 298.) His back felt about the same at work as at home. (*Id.*) He also informed her that the prior

week he "travelled," presumably for business, without difficulty, and that he had an upcoming conference in Philadelphia the following week. (*Id.*) After examining Seals, nurse Morris concluded he had no deficits in "speech or demeanor" and "appear[ed] to be functioning normally." (*Id.* at 298.) Nonetheless, her assessment also noted that some of his complaints stemming from as far back as 2003, including pain, weakness, numbness, and tingling, were "Active." (*Id.*) She released him home, deciding that he would "remain off of work until he can see his doctor" to adjust his pain medications. (Doc. 10 at 299.) In a subsequent email characterizing the meeting, Seals said he was sent home because he "was working from my office floor due to pain" and the medical staff was concerned that his medications could impair his decision-making. (*Id.* at 344.) This was the last time he worked during the relevant period. (Doc. 12 at 2; Doc. 13 at 9.)

The next week he called in to report that his doctors wanted him to remain off work until he could better manage his pain. (Doc. 10 at 301.) In November, Dr. Nahata completed an Employee Health Certification Form stating that Seals could not return to work, and also offering various restrictions on his standing, sitting, climbing, kneeling, and lifting, among others. (*Id.* at 303.) The duration of his conditions was indefinite, but they would probably last six months. (*Id.*) The specific impairments were back spasms, "anxiety/mood" issues, and sleep disturbances. (*Id.* at 305.) Another similar form completed around the same time by Dr. Delicia Pruitt expressed the same conclusion and added additional impairments, including PTSD, anxiety, depression, visual disturbances, headaches, and short-term memory loss. (*Id.* at 178, 308.)

3.    *Application for Benefits and Initial Decision*

6

Plaintiff filed for benefits with Liberty in early December 2012.[3] Since Liberty's internal notes mark the date he last worked as September 26, it appears that Liberty is treating his disability onset date as the next day, September 27. (*Id.* at 79, 475; Doc. 12 at 6.) In January 2013, he reported to nurse Morris that his pain was still uncontrolled and that his mood fluctuated; on some days he felt anxious and depressed, on others optimistic. (Doc. 10 at 315.) Liberty's case manager followed up with Seals throughout December 2012 and January 2013, seeking information about his doctors so that Liberty could request their records. (*Id.* at 78-79.) According to a letter Liberty wrote to Seals on January 7, it had just that day received his authorization to contact his physicians, Dr. Nahata and Dr. Pruitt, and his psychiatrist, Dr. Michael Ingram. (*Id.* at 605, 625.) The letter also said that although the Policy gave him until March 29, 2013 to submit proof, Liberty requested that all supporting evidence be submitted by January 21, 2013 at the latest. (*Id.* at 606.) The letter implies, and the parties seem to agree (Doc. 12 at 3; Doc. 13 at 10), that Liberty had not yet received any documentation. (Doc. 10 at 605-06.)

On the same day, Liberty sent the two physicians and the psychiatrist requests for their treatment notes and asked they complete a Functional Status form and send all materials by January 15, 2013. (*Id.* at 607, 643, 648, 652.) By January 25, when Liberty issued its initial denial, the only report it had received was Dr. Ingram's Function Status form. (*Id.* at 595, 608-10; Doc. 12 at 3.) The scrawled responses on that form indicate Seals was depressed, had poor short-term but intact long-term memory, had "fleeting" thoughts of suicide, reported crying, could attend to some activities of daily living, and was on medication. (Doc. 10 at 608-10.) Aside

---

[3] The filing occurred on either December 5 or 6. Seals says he filed on December 5, pointing to a letter from Liberty listing that date. (Doc. 13 at 9 (citing Doc. 10 at 86).) Liberty's brief dates the filing on December 6, citing the first entry of a claim in their electronic records log. (Doc. 12 at 2 (citing Doc. 10 at 81).)

from Plaintiff's ability to attend to "some" daily activities, Dr. Ingram did not suggest which functions Seals retained and admitted that Seals's capacity to work was "unknown." (*Id.* at 609.) Consequently, Liberty denied the claim because it lacked evidence "to compare your restrictions to the requirements of [his] job . . . ." (*Id.*) He had 180 days to request a review of the decision, and if he did, Liberty requested additional medical evidence. (*Id.* at 610-11.)

### 4. Appeal and New Evidence

The day after issuing its decision, Liberty began receiving a deluge of evidence, including records from Dr. Ingram, Dr. Nahata, and Dr. Pruitt, and a June 2012 evaluation from Dr. Amanda Schafer. (*Id.* at 510-537, 544-66; Doc. 12 at 3-4; Doc 13 at 10.) On February 1, 2013, Seals faxed a letter stating he was appealing the decision. (Doc. 10 at 499.) Later, Seals submitted more records. (Doc. 12 at 4-15.)

The record-gathering and -disclosing process was fitful and the parties use most of the factual statements in their briefs just to explain when certain files were received and who reviewed those files and when those filed were supplemented and who conducted a subsequent review and so on. In this subsection I consider all evidence Liberty reviewed before denying his appeal, including the file-reviews it ordered from non-examining medical sources. The next subsection addresses subsequently submitted evidence and file-review reports.

### A. Dr. Pruitt's Records

It is worth noting at the outset that Dr. Pruitt, who is characterized as Plaintiff's primary caregiver (Doc. 12 at 4), appears to have worked in the medical practice of Plaintiff's uncle throughout the period the record covers. A Dr. Eugene Seals handled much of Plaintiff's care after the 2001 accident and was then listed as Plaintiff's primary physician. (Doc. 10 at 196-202, 204-07.) A note from nurse Morris after the more recent accident states that Dr. Seals is

Plaintiff's uncle and, together with Dr. Nahata, had been "managing his care." (*Id.* at 297.) Dr. Pruitt, in turn, seems to have taken over as his primary physician and her treatment records and letters all have a "Seals Medical Care" heading. (*Id.* at 322, 543-50.) Dr. Seals also submitted an opinion form indicating his nephew could not return to work. (*Id.* at 135.) Additionally, many of the files from Dr. Pruitt have electronic notations on them signifying that Dr. Seals "Finalized" the file on certain dates; since the files are not signed by Dr. Pruitt, and Dr. Seals is listed in some files as the physician prescribing the medications, this raises the possibility that they came from appointments with Dr. Seals. (*Id.* at 544, 546, 548.)

Dr. Pruitt's notes begin a week after the April 2012 car accident. (*Id.* at 544.) Seals had pain, depression, face and neck injuries, lumbago, and back spasms; the notes state both that he had and did not have shortness of breath. (*Id.*) The examination was unremarkable and Dr. Pruitt decided to order physical therapy. (*Id.* at 543-44.) Another appointment later in April was largely the same, though she also prescribed Lexapro, an anti-depressant. (*Id.* at 547.) In September 2012—shortly before Plaintiff left work—a brief treatment note found that he was alert, oriented, and had normal judgment, attention, concentration, and insight; but he was depressed and anxious. (*Id.* at 545.) Physically, his gait was normal and he had some pain with lumbar spine movements. (*Id.*) Dr. Pruitt referred him to Dr. Ingrahm and concluded he was "disabled due to cognitive delay and mood disorder [sic]." (*Id.*)

The next visit, in October, listed the same general complaints—along with the contradictory notes on shortness of breath—and Plaintiff denied general weakness, fatigue, and difficulty sleeping. (*Id.* at 546.) Dr. Pruitt encouraged him "to get his education upgraded and start another career." (*Id.*) In December Seals told Dr. Pruitt of new problems, including sadness, memory loss, sleep difficulties, and "[p]sychiatric symptoms." (*Id.* at 549.) In particular, his

memory loss troubled him; as an example, he said "[h]e recently spent thousands of dollars on new furniture despite future plans for a job. He has not [sic] explanation for this. This is not his usual pattern of behavior." (*Id.*) Nonetheless, he denied frequent crying spells, suicidal thoughts, and, oddly, "stress." (*Id.*) His physical pain was intense, he reported, causing stiffness, limited mobility, and joint swelling. (*Id.*) Yet the physical examination of his musculoskeletal system, which thoroughly details his range of motion throughout his body, was completely normal except for "Synovial thickening of MCP's and wrists." (*Id.* at 550.) And psychiatrically, he was alert, had appropriate mood and affect, showed a normal attention span and ability to concentrate, and was properly oriented; Dr. Pruitt added that his judgment was poor. (*Id.*) Her conclusions again center on his "cognitive decline due to anxiety and memory loss," and it appears that these were the reasons she reiterated his inability to work, as her treatment plan did not mention any physical symptoms. (*Id.*)

Along with her records, Dr. Pruitt submitted a "Restrictions Form." (*Id.* at 542.) She failed to offer any restrictions, however, referring to Dr. Nahata's and Dr. Ingram's forms and leaving hers blank. (*Id.*) She did answer the question asking for "medical/psychological findings that support the noted restrictions," stating that Seals had "herniated disks, memory loss, [and] anxiety" as documented in her notes. (*Id.*)

### B.     Dr. Nahata's Records

Dr. Nahata's files include the emergency room records following the April 2012 car crash. At the hospital, Seals could not recall if he ever lost consciousness, but he did complain of right wrist, lower back, and neck pain and the examination confirmed tenderness in all of these areas. (*Id.* at 554-55.) However, he had normal strength and behavior, and no sensory deficits. (*Id.* at 555.) A lumbar CT scan found no fractures or dislocation; a cervical CT scan likewise

10

uncovered no fracture or spondylolisthesis, and displayed only minor degenerative changes at one disc level. (*Id.* at 555-57) His cranial CT scan was similarly normal, and even the x-ray of his right wrist "showed no acute fracture or dislocation." (*Id.*)

Dr. Nahata examined Seals several times in 2012. During a June visit Seals claimed to have, among other symptoms, back pain, limited mobility, a history of seizures, poor memory, depression, equilibrium problems, vertigo, fatigue, shortness of breath, muscle cramps, migraines, sinus problems, nose bleeds, irregular heart rate and palpitations, skin and hair loss, impotence, and gastrointestinal difficulties. (*Id.* at 581.) The examination, however, found regular heart rate and rhythm; clear breathing; mild strains, spasms, and tenderness in his back; motions with his lumbar spine were "slightly painful"; negative straight leg raise and Trendelenburg tests; functional ranges of motion in his arms; and generally normal muscle strength. (*Id.* at 581-82.)

By July, Seals had recently completed physical therapy, feeling that it helped and that he was "doing better." (*Id.* at 551.) He was eager to return to work, the notes indicate. (*Id.*) Dr. Nahata also reviewed the recent neuropsychological report from Dr. Schafer. Summarizing, he said that Dr. Schafer noted while Seals had "some mild depression and subjective cognitive complaints," he "had no significant decline from his previous functioning," no signs of brain injury, and "[n]o significant cognitive memory deficits on neuropsychological evaluation." (*Id.* at 551-52.) His depression and anxiety were "mild." (*Id.* at 552.) Dr. Nahata's examination found that Seals's back and shoulders were mildly tender, but had no mobility deficits and his strength was normal. (*Id.* at 551.) There was also some indication he had mild sciatica pain in his right leg, though the examination did not find evidence from the straight-leg raise test that the pain radiated. (*Id.* at 551-52.)

11

In August, Seals underwent an MRI, which "showed a small central disk protrusion at L5-S1 resulting in very mild spinal canal and neural foraminal stenosis." (*Id.* at 587, 589-91.) Around the same time, he went to the hospital with severe back pain after collapsing at home. (*Id.* at 587.) Dr. Nahata's examination revealed only mild strain and spasm in the cervical spine, and spasm and tenderness in the lumbar spine. (*Id.*) Seals also displayed radicular pain, though his strength was generally normal. (*Id.* at 587-88.) The September examination was nearly identical. (*Id.* at 583-84.) Dr. Nahata prescribed a lumbar brace and recommended that Seals go to a pain clinic for possible epidural injections. (*Id.* at 584.)

Dr. Nahata completed a "Restriction Form." (*Id.* at 537.) Seals could perform sedentary tasks on a full-time basis; these would require him to occasionally lift ten pounds, at most, and sit for over 50 percent of the day with occasional walking. (*Id.*) To support his opinion, Dr. Nahata simply pointed to Seals's lumbar pain and spasm, decreased range of motion, mood disorders, and mild cognitive difficulties. (*Id.*)

C.      Dr. Ingram's Records

Dr. Ingram first saw Seals in October 2012, diagnosing him with depression, PTSD, and generalized anxiety disorder. (*Id.* at 533.) Seals began by claiming to have experienced a "meltdown" soon after his 2012 accident, forcing him to travel out of state, for some unstated reason, and that another meltdown occurred in September. (*Id.* at 528-29.) In addition to his other symptoms, he claimed nightmares, flashbacks, avoidance behavior, heart problems, and "increased startle response." (*Id.* at 529-30.) No previous psychiatric treatment was in his record, Dr. Ingram noted, and his anti-depressants were prescribed by physicians. (*Id.* at 529.) On examination, Dr. Ingram observed that Seals was cooperative, he spoke clearly, and was properly oriented. (*Id.* at 530.) His intermediate and long-term memories were intact; but during a test of

12

short-term memory, Seals "was able to recall one out of three items after five minutes." (*Id.*) Dr. Ingram concluded with a vague statement on Seals's ability to work: "I also suggested to the patient that with his symptoms . . . it may not be an option for him to return to his previous [work] level. I told the patient I will respect whatever his wishes or desires were, but in terms of neuropsychological testing I cannot give a good estimate about long-term probability returning [sic] to work." (*Id.* at 531.)

Seals returned in November, admitting to "fleeting thoughts of suicidal ideation" without any specific plans. (*Id.* at 523.) He now also professed to experiencing visual hallucinations and added that his depression had worsened. (*Id.* at 522, 524.) Nonetheless, he described his depression as "mild" (*id.* at 523), and repeated that characterization during the December session. (*Id.* at 517.) His PTSD, in contrast, was "moderate." (*Id.* at 518.) At the end of January 2013, Seals claimed to be "decompensating," pointing out his increased irritability and adding manic episodes to his list of symptoms. (*Id.* at 510-11.) It is unclear whether he was still characterizing his depression as "mild."[4] (*Id.* at 511.) An unexplained remark in the notes states that Seals's posture and gait were abnormal. (*Id.*)

D.     Dr. Schafer's Evaluation

Dr. Schafer evaluated Plaintiff on July 12, 2012, on Dr. Nahata's referral. (*Id.* at 561.) Seals was able to describe the events surrounding his recent accident "in fairly good detail," Dr. Schafer noted. (*Id.*) He also stated that his 2001 accident had caused "long-standing cognitive impairments . . . ." (*Id.* at 562.) A more elaborate psychiatric history was elicited, with Seals explaining that he became depressed in 2008 and, though never hospitalized, he said his

---

[4] The same reference to "mild" depression appears here, but during this session it could very well be an unexpunged remnant from previous notes. The paragraph it resides in was copied wholesale, it seems, from prior sessions, and a new paragraph was added above it containing the same type of information, some of which conflicts. (*Id.* at 511.) The point is not critical to the outcome, but does caution against undue faith in the usefulness and determinacy of the documentary record.

physicians threatened to hospitalize him around that time. (*Id.*) He began taking Lexapro and achieved good results, such that he had weaned off of it by the time of his 2012 accident. (*Id.*) Anxiety about the crash fueled his increased emotionalism and Dr. Schafer also observed some PTSD type symptoms from his description of the accident's aftermath. (*Id.*)

Seals's chief complaints were "impaired memory, processing speed, concentration, blurred vision, and impaired oral language comprehension." (*Id.*) He also suffered significant back pain. (*Id.* at 563.) Despite these problems, he was completely independent in his daily activities, except he needed reminders about medications and bills and had some "trouble doing household upkeep . . . ." (*Id.*) Seals had a successful record at work, but about half a year prior he began working under a new supervisor and their relationship was strained. (*Id.*)

Dr. Schafer's examination began with the observation that Seals's physical and mental behavior was unremarkable, none of it indicating any cognitive deficiencies of physical disabilities. (*Id.* at 564.) She administered a bevy of assessments testing his cognitive functioning, noting that secondary testing established the validity of the primary test results. (*Id.*) Plaintiff's overall intellectual ability was average, perhaps in the high end of the range, and showed no decline from before the accident, based on demographic and other factors allowing a reasonable estimate of any changes. (*Id.*) Likewise, his language and visuospatial skills were normal; his indexed attention scores were average; his executive functions, such as planning and mental organization, were average; and his motor functioning scores were average or above average. (*Id.* at 564-65.) The psychological testing consisted of two tests, the first being a self-reported inventory of symptoms called the Beck Depression Inventory. (*Id.*) The results suggested severe depression, but he denied sadness or suicidal ideation. (*Id.*) The other test compared Seals's responses to those of known populations and found "[t]here was a tendency

14

toward somatic and cognitive exaggeration" and also that his complaints "may reflect heightened distress." (*Id.*)

Concluding, Dr. Schafer wrote that Seals was "universally in the average to above average range across a broad spectrum of cognitive tests. There was no indication of decline from a previously higher level of functioning, no signs of dementia. In sum, there is no indication of brain injury residua." (*Id.*) She believed that depression was the likely cause of his cognitive concerns and recommended continuing psychotherapy and Lexapro. (*Id.*) "[F]rom a cognitive perspective," he was "free to return to work . . . ." (*Id.*)

### E.     Nurse Penny Percey's File Review

After the above evidence had been submitted, Liberty asked Nurse Penny Percey to review it and draft a report. (*Id.* at 73, 495.) She first noted that none of the records from his recent accident suggested acute injuries and Dr. Nahata's MRI showed mild back degeneration and tenderness. (*Id.* at 73.) He was excused from work in September due to his pain medications. (*Id.*) His depression was "mild" according to Dr. Ingram's notes and while he was encouraged to work with a therapist, the record did not contain any such therapy files. (*Id.*) Nurse Percey also summarized Dr. Schafer's findings. (*Id.*) Further, she wrote that despite subjective complaints, the record did not support any mental disability, and the objective "findings related to his various [physical] . . . complaints . . . are minimal." (*Id.*) Consequently, she concluded that his conditions did not "support restrictions" at work. (*Id.*)

### F.     Dr. Peter Sugerman File Review and Addendum

After receiving nurse Percey's report, Liberty referred the claim to its Review Unit, which ordered an independent file review by psychiatrist Peter Sugerman. (*Id.* at 72; Doc. 12 at 6.) Dr. Sugerman's report summarized the evidence, then answered a series of questions,

15

presumably posed by Liberty. (Doc. 10 at 475-79.) The summary offers an accurate account of the evidence. (*Id.*) Asked to describe Seals's symptoms and related impairments, Dr. Sugerman undertook a methodical analysis. He compared the complaints to Dr. Pruitt with those to Dr. Ingram; the overlap of reported somatic symptoms led Dr. Sugerman to doubt that they were entirely attributable to psychiatric conditions. (*Id.* at 477.) Dr. Schafer's report was also important in Dr. Sugerman's analysis, particularly its conclusion that Seals may exaggerate his complaints. (*Id.* at 477-78.) This, along with the high volume of complaints, "relative lack of objective data," and the comorbid pain symptoms made the analysis difficult. (*Id.* at 478.)

Taking the symptoms in seriatim, Dr. Sugerman acknowledged Seals's depression and the more recent "fleeting" suicidal ideation. (*Id.*) He did not think this new development was particularly worrisome since Dr. Ingram had not instituted more intensive treatment as a result. (*Id.*) Consequently, Dr. Sugerman could not find evidence that his depression had worsened after the September 27 disability onset date and he concluded that the data was insufficient "to associate depression with impairment." (*Id.*) Next, Dr. Sugerman noted the manifestations of Seals's anxiety but found them less severe than they might have been if his condition was debilitating; for example, if it caused him agoraphobia or emergency room visits due to panic attacks. (*Id.*) The PTSD similarly had "not led to severe problems such as dissociative episodes or rage outbursts." (*Id.*) Thus, the file did not contain enough relevant evidence of diagnostically severe symptoms. What severe symptoms there were, such as suicidal ideations, had only occurred occasionally and were further diminished by Seals's tendency to exaggerate. (*Id.*) In short, Seals had not consistently experienced truly severe impairments and his course of treatment had not reflected concern that he had such impairments. (*Id.*)

Dr. Sugerman also wrote that the only objective evidence supporting Seals's complaints of memory loss and cognitive deficits was the observation in Dr. Ingram's September notes that Seals recalled only one of three words after five minutes. (*Id.* at 479.) Standing against this piece of evidence was Dr. Schafer's thorough review, which found no evidence corroborating the subjective complaints. (*Id.*) Further, the level of treatment was minimal—Seals saw Dr. Ingram once a month and, generally, they made minor adjustments to his medications. (*Id.*) Dr. Sugerman thus concluded that Seals was not disabled:

> From a psychiatric perspective, impairment beyond 9/27/12 cannot be defined based on available medical records. The exaggerated level of complaints and a lack of a return to work pursuit by the claimant leaves open the possibility that the claimant is not seeking to demonstrate an ability to work. Analysis of the data does not confirm an inability to function based on a psychiatric condition.

(*Id.*)

A few days later, after Dr. Sugerman finally spoke with Dr. Ingram about the case, he prepared an addendum. (*Id.* at 483-84.) Apparently Seals had recently been hospitalized for suicidal ideation, and Dr. Sugerman thought this displayed a decline in his condition. (*Id.* at 471.) For at least two weeks since March 9, Dr. Sugerman estimated that Seals had "psychiatric functional limitations." (*Id.*) What those limitations were and whether they precluded a return to work, he did not say. However, he rejected Dr. Ingram's "advocacy" for an earlier impairment date based on Seals's successful work history and failed work attempt in the summer of 2012. (*Id.*) To Dr. Sugerman, this was premised more on a credibility assessment of Seals's subjective complaints than an objective view of the meager evidence propping up those claims. (*Id.* at 471-72.) He then ended by noting that "objective and global mental health data is not provided to support impairment since 9/27/12, from a review perspective." (*Id.* at 472.)

G.      Occupational Therapy Records and New Medical Reports

17

Shortly after Dr. Sugerman's review, Seals submitted physical therapy and chiropractic records and additional medical reports. (*Id.* at 379-465.) The physical therapy notes come from the end June 2012, followed by an occupational therapy report completed in July, all of which took place through Covenant HealthCare. (*Id.* at 379-88.) They indicate Plaintiff's strength was normal—"4/5" or "4+/5"—in all areas, he could sit and walk reasonable lengths of time, his pain level stayed at "0-1/5," and he met all the therapeutic goals and desired to return to work. (*Id.* at 379-83.) The ending assessment found he had "functional trunk mobility and strength." (*Id.* at 384.)

The occupational therapy report, completed the next month, states that Seals rated his pain at level two-out-of-five on a Visual Analog ("VA") scale. (*Id.* at 386.) The informal testing showed his "active range of motion, muscle strength, sensation, and coordination were within normal limits" in his arms and legs. (*Id.*) Visual testing likewise returned without abnormalities. (*Id.* at 387.) As an indication of cognitive abilities and his psychological state, the report notes that he followed directions and answered questions without issue during the entire evaluation, and never displayed signs of depression. (*Id.*)

The reports from Covenant also include medical treatment notes beginning after his accident. (*Id.* at 388-96.) The notes include his August 2012 trip to the emergency room after his back pain flared and he collapsed. (*Id.* at 388.) At the hospital, the examiners confirmed back pain but found no shortness of breath, joint swelling, or limits to his range of motion. (*Id.* 399-400.) Reviewing the results and also past records, the physician noted Seals had "[n]o history of acute injury" and sent him home with medications. (*Id.*)

The Covenant files also contain the notes from Seals's March 2013 hospital visit for suicidal thoughts, when he told the examiner that he had attempted suicide once in the last year.

18

(*Id.* at 401.) He did not have any present plans to kill himself, but he exhibited several risk factors according to the examiner. (*Id.* at 401-03.) The physical examination flagged only his sore back, and despite the pain he displayed normal range of motion. (*Id.* at 402.) According to the notes, Seals left the hospital to attend inpatient treatment. (*Id.* at 403.)

The chiropractic records span numerous sessions from May 2012 until March 2013. (*Id.* at 406-464.) When he started, Seals claimed the pain was severe, rating it at ten-out-of-ten on a VA scale. (*Id.* at 458.) He also had back spasms, edema, and limited mobility. (*Id.* at 459.) By the end of June, these other conditions remained but the pain had decreased to a more manageable level. (*Id.* at 453, 462-63.) The reports contain many references to misalignments, spinal curvature abnormalities, and subluxation, and the chiropractors also found swollen muscle fibers and limited range of motion in his neck and lower back, although these findings appear to be boilerplate as they are phrased in the same language in nearly every session note, as are the references to his slow progress rate. (*Id.* at 406-55.) Indeed, the paragraphs under the "Objective Findings" portion in the notes remain identical throughout. (*Id.*) The notes generally lack specific, relevant, and up-to-date information on Seals's progress. An exception, the session following his August 2012 emergency room visit relates that he reported recently decreased mobility. (*Id.* at 432.) "Up until this point," the report states, "Kris has been reporting decreased pain and increased range of motion from visit to visit. Kris reports that he has never had a problem bending over prior to his last car accident, and has never had an issue like this while bending over to pick something up."[5] (*Id.* at 408, 432.) At the next session, he still struggled to bend forward (*id.* at 409) and, subsequently, he rated his pain as more severe than before the

---

[5] The last sentence was cut off on the page. It reads, "Kris reports that he has never had a problem bending over prior to this[.]" (*Id.* at 432.) The sentence, which should have continued on the next page, ends at that point; but the remaining part of the sentence was found elsewhere in the notes. While that second part is not dated, it seems reasonable to couple the two remarks.

August episode. (*Id.* at 403-21.) A random paragraph from November 2012, included under the "Subjective" heading, suggested that Seals had reached the maximum recovery possible, despite the ongoing pain, yet recommended increasing the frequency of his chiropractic treatments. (*Id.* at 417.)

### H.    Dr. Jamie Lewis's File Review

After receiving the above files, Liberty requested a physician's peer review. (*Id.*) On April 17, 2013, Liberty received a full report by Dr. Jamie Lewis concluding that Seals was not disabled. (*Id.* at 363-69.) Dr. Lewis appears to have reviewed all of the available medical files from after the 2012 accident relating to Seal's physical condition. (*Id.* at 366-67.) He extensively and accurately summarized the evidence and also described the demands of Seals's position at Dow. (*Id.* at 364-67.)

From his review, Dr. Lewis determined that Seals could "work unrestricted hours at a full time capacity without restrictions . . . ." (*Id.* at 368.) None of the evidence translated his pain or conditions into any functional limitations, he added. (*Id.*) In support, Dr. Lewis emphasized that the physical therapy records suggested decreased pain and the physical examination results consistently found regular strength and range of motion, without any significant sensory deficits. (*Id.* at 369.)

### I.    Appeal Denial

Following Dr. Lewis's report, Liberty denied the appeal by letter sent on April 25. (*Id.* at 347.) The decision reviewed the evidence that had been compiled, noting that the recent submissions that came after Seals requested an opportunity to offer documents from his neurosurgeon contained only forms from physical therapy, occupational therapy, the chiropractor, and emergency room records. (*Id.* at 350.)  The letter quoted liberally from the

reviewing sources before explaining why Liberty was denying the appeal. (*Id.* at 347-51.) Ultimately, Liberty determined that "the medical evidence does not support a musculoskeletal condition that would prevent you from performing your job continuously throughout the Elimination Period from 9/27/12 through 03/27/13," the letter informed Seals. (*Id.* at 351.) The psychiatric evidence likewise did not support finding a disabling impairment. (*Id.*) As a result of the appeal denial, the letter concluded, Seals had exhausted his right to administrative review and his case would be closed. (*Id.*)

### 5.    *Subsequent Evidence, Review, and Work Attempt*

Reviewing the decision, Seals noticed that his neurosurgeon's records had not been considered. (*Id.* at 70, 344.) He called and faxed Liberty on May 5 to complain of this oversight, stating he had submitted them with his chiropractor and physical therapy records in March. (*Id.*) Liberty could not find the records in its file, but allowed Seals to submit them for review by the Appeals Council. (*Id.* at 69.) He then sent them to Liberty on June 5. (*Id.* at 268; Doc. 12 at 13.)

Included in the new files were treatment notes from sessions with Dr. Nahata in the spring of 2013. (*Id.* at 323-28.) On March 14, 2013, shortly after his visit to the emergency room for depression, Seals returned to Dr. Nahata's office. (*Id.* at 323.) He told Dr. Nahata that after leaving the emergency room he checked into White Pines, an inpatient psychiatric unit. (*Id.* at 324.) Discussing his physical condition, Dr. Nahata mentioned a recent MRI taken on March 12, 2013, that showed degenerative disc desiccation and mild disc herniation, both at L5-S1, without nerve root compression. (*Id.*) Compared to a previous MRI, the "extruded disk at L5-S1 has mildly improved." (*Id.*) During the examination, Seal's heart rate and rhythm were regular, he was conscious and oriented, his strength was normal, his range of motion was "within functional limits," and he had mild strain, spasms, and tenderness in his back. (*Id.*) Seals denied "bladder or

21

bowel incontinence." (*Id.*) Dr. Nahata concluded that Seals should continue taking his prescription medications and also introduce gentle exercises into his routine. (*Id.*) However, he added that Seals "will continue to be off from work at this time and the patient at this time cannot resume working with his mental capacity." (*Id.*)

Later in March, Seals visited neurosurgeon Dr. David Udehn to examine his back. (*Id.* at 329-36.) Seals gave a thorough account of his accidents—this time including one from 1996— and his symptoms, including, among others, severe back pain radiating to his right leg, numbness, tingling, "problems with both hands," constipation, diarrhea, and incontinence. (*Id.* at 330.) He also told Dr. Udehn that Dow sent him home in September 2012 because of his back pain. (*Id.*) The pain generally rated at seven or eight out of ten, sometimes going to level ten but never below level five. (*Id.* at 331.) Sitting, standing, walking, and lying down all increased the pain. (*Id.*) On examination, his heart sounded normal, and his range of motion, stability, and motor skills were all normal. (*Id.* at 333.) He walked normally and could perform heel and toe walking as well. (*Id.*) His spine was normal except some restrictions in mobility and spasms, and his mental characteristics appeared regular as well. (*Id.*) Dr. Udhen also compared three MRIs of Seals's lumbar spine: the first from March 2011 was normal; the second from August 2012, noted above, showed mild bulging at the L5-S1 level "resulting in very mild spinal canal and neural foraminal stenosis"; and the third, from March 2013 showed that the bulge had decreased and the disc hernation at that level had "mildly improved." (*Id.* at 334-35.)

Dr. Udhen's notes about the improved MRI results are difficult to understand[6] but seem to suggest that even with the improvements Seals might still have discogenic syndrome, possibly requiring a disc fusion and more conservative treatments. (*Id.* at 336.) The plan was to prescribe

---

[6] Discussing the MRI, he states, "His most recent in [M]ay show some improvement. However the presence of a central herniation demonstrates that he does have an annular tear and even with the improvement would have to be to surgeon about the possibility of discogenic syndrome." (*Id.* at 336.)

physical therapy, ice packs, and facet block injections. (*Id.*) Dr. Udhen also told Seals to avoid "bending, lifting, [and] carrying," and limited him to "[s]edentary work with frequent breaks as tolerated part time." (*Id.*) When Seals returned in May, he said the facet blocks provided "70-80% relief," though he "still has some pain in the right low back." (*Id.* at 337.) The notes are otherwise identical to the March report, even the examination results portion. (*Id.*)

Also in May, Seals informed Dr. Nahata that the facet block provided relief. (*Id.* at 326.) The physical examination results matched the previous session's. (*Id.* at 327.) The recommendations section of the report simply states that Seals "will continue to be off from work at this point and will be on the same restriction." (*Id.*)

The new submissions also included a letter from Dr. Pruitt, dated May 28, 2013, describing Seals's medical history. (*Id.* at 322.) Particularly relevant to the present case, she offered two explanations for why Seals left work in September 2012. (*Id.*) First, she said he was sent home because "[h]e was told he could not work while taking such strong pain medications." (*Id.*) Later, she added that he could not "do his job due to the fact that he was sent home from Dow," continued to need pain medications, and his "cognitive symptoms were not yet fully managed." (*Id.*) Yet she also explained his September departure as a result of his cognitive delay and severe back pain—he was working on the floor in his office, she notes. (*Id.*)

Finally, Seals also provided new materials from Dr. Ingram. (*Id.* at 117-18; Doc. 12 at 15 n.4.) Dr. Ingram explained that Dr. Schafer's findings were not uncommon in people with depression, and that any claim that the record lacked objective evidence misunderstands the nature of psychiatric diagnoses. (*Id.* at 117.) Liberty did not review this, it claims, because it allowed submission of only neurosurgical records, not psychiatry files. (Doc. 12 at 15 n.4.) Consequently, Dr. Lewis's addendum reviewing the new files did not consider Dr. Ingram's

materials. (Doc. 10 at 91.) Apparently, Seals takes issue with this. He complains that Liberty "[r]efus[ed] to review all medical records submitted for its final appeal, although it gave Mr. Seals permission to submit more records, Liberty denied Mr. Seals final appeal." (Doc. 13 at 13.) For this proposition, he cites to the final denial letter, sent on July 1, 2013 (Doc. 10 at 86) and an email referring to Liberty's allowance of additional submissions. (*Id.* at 109.) The only suggestion in either of these that Liberty declined to review materials was in the letter, which said it would not consider Dr. Ingram's submission since the opportunity to submit was given because Seals had claimed to have submitted neurosurgical records prior to the April appeal denial. (*Id.* at 91.) Thus the post-denial submission window was open only for those materials. Consequently, there is no substance to Seals's statement, which he fails to elaborate in any case, that Liberty shirked its review duties.

Liberty asked Dr. Lewis to draft an addendum to his prior report in light of the new evidence. (*Id.* at 216-17.) His addendum, completed at the end of June, maintained that the recent materials did not warrant finding Seals disabled. (*Id.* at 94-99.) Dr. Lewis again reviewed the records, including the new files as well as the 2001 notes. (*Id.*) Nothing in the new materials changed his opinion, Dr. Lewis concluded, acknowledging Seals's consistent complaints of pain, but pointing instead to the more probative strength and sensory testing results, which were normal. (*Id.* at 98.)

### 6. *Final Denial*

On July 1, 2013, Liberty issued its final denial. (*Id.* at 86-92.) The letter to Seals repeated and summarized the process used to reach the previous decisions and also Dr. Lewis's addendum report. (*Id.*) After describing those findings, the letter informed Seals that the final decision rendered in April would not be overturned, no new files would be reviewed, and his

administrative remedies had been exhausted. (*Id.* 91.) The following month, Seals returned to work, but he soon thereafter took another medical leave and asked to "reopen" his benefits claim. (*Id.* at 68; Doc. 12 at 15.) Told he needed to file a new claim, Seals submitted the paper work and was denied for failing to comply with the "Elimination Period" Policy provision.[7] (Doc. 10 at 685-90; Doc. 12 at 15.)

## III. Law and Analysis

### a. Standard of Review

In the Sixth Circuit, courts do not strictly follow the Rule 56 summary judgment standard when reviewing an ERISA benefit determination. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). Instead of rendering a threshold decision on whether material factual disputes exist, courts conducting *de novo* review are to examine the administrative record and make "findings of fact and conclusions of law accordingly," taking into consideration arguments about the "proper analysis of the evidentiary materials contained in the administrative record" but not admitting or considering any extraneous evidence. *Id.* Only if the plaintiff issues a procedural challenge to the administrator's decision, such as lack of due process or bias, can the court consider materials outside the record. *Id.* An accusation that the administrator had a conflict of interest, for example, could open the door to such evidence. *See, e.g.*, *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286 n.2 (6th Cir. 2005) (noting that the parties could have explored the alleged conflict of interest through discovery).

ERISA does not provide an explicit standard for reviewing benefit eligibility challenges. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108-09 (1989). The default standard is therefore *de novo* review of the administrator's or fiduciary's decision, *id.* at 115; *Ross*, 558 F.3d at 608, applying to both the factual findings and legal conclusions. *Wilkins*, 150 F.3d at 613.

---

[7] Seals does not appear to dispute this denial and this record does not show its administrative progress.

Under this standard, the court does not give "deference to the decision" or presume its correctness, but instead asks whether it is correct. *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990). Put differently, the court "'simply decides whether or not it agrees with the decision under review.'" *Miller v. Hartford Life Ins. Co.*, 348 F. Supp. 2d 815, 817 (E.D. Mich. 2004) (quoting *Anderson v. Great W. Life Assurance*, 777 F. Supp. 1374, 1376 (E.D. Mich. 1991)). Accordingly, courts have looked to see whether the preponderance of the record evidence supports disability. *James v. Liberty Life Assurance Co. of Boston*, 984 F. Supp. 2d 730, 736 (W.D. Mich. 2013) (*James I*) *aff'd by* 582 F. App'x 581 (6th Cir. 2014) (*James II*) (agreeing that preponderance of the evidence supported finding disability).

Where the plan gives the fiduciary or administrator discretion to determine eligibility, the arbitrary and capricious standard is used on review. *Bruch*, 489 U.S. at 103; *Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005). This standard applies when the policy expressly "grants the administrator authority to determine eligibility for benefits or to construe the terms of the plan." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). Nonetheless, the plan may give such authority without the use of any "'magic word,'" like "discretionary." *Renfro v. UNUM Life Ins. Co. of America*, 920 F. Supp. 831, 837 (E.D. Tenn. 1996) (quoting *Blcok v. Pitney Bowes Inc.*, 952 F.2d 1450, 1453 (D.C. Cir. 1992) (per Ruth Bader Ginsburg, J.)). If the decision is reviewed under this standard, the court will uphold it as long it resulted from "'a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Whitaker*, 404 F.3d at 949 (quoting *Baker v. United Mine Workers of America Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)).

In Michigan, however, the regulatory body overseeing insurance policies, the Michigan Office of Financial and Insurance Services ("OFIS"), has prohibited policies enacted or revised

after July 1, 2007 that grant discretionary authority which would trigger the arbitrary and capricious review standard. Mich. Admin. Code R. 500.2201-02 (2015). *See also Ross*, 558 F.3d at 602-03; *Rice-Peterson v. UNUM Life Ins. Co. of America*, No. 11-14565, 2013 WL 1250457, at *7-8 (E.D. Mich. Mar. 26, 2013). According to the regulations

> (b) On and after [July 1, 2007] . . . an insurer shall not issue, advertise, or deliver to any person in this state a policy, contract, rider, indorsement, certificate, or similar contract document that contains a discretionary clause. This does not apply to a contract document in use before that date, but does apply to any such document revised in any respect on or after that date.

> (c) On and after [July 1, 2007] . . . a discretionary clause issued or delivered to any person in this state in a policy, contract, rider, indorsement, certificate, or similar contract document is void and of no effect. This does not apply to contract documents in use before that date, but does apply to any such document revised in any respect on or after that date.

Mich. Admin. Code R. 500.2202(b)-(c). A discretionary clause "purports to bind the claimant to or grant deference in subsequent proceedings to the insurer's decision, denial, or interpretation" of the policy. *Id.* R. 500.2201(c). A clause meets this definition by, among other things, giving rise to a standard of review on appeal other than *de novo* review. *Id.* R. 500.2201(c)(vii). The Sixth Circuit has found that ERISA, which explicitly supersedes state laws on employee benefit plans, 29 U.S.C. § 1144(a), does not preempt these regulations. *Ross*, 558 F.3d at 609. As a result of these regulations, "any ERISA plans issued or amended after July 1, 2007 requires '*de novo* review of denials of ERISA benefits within Michigan.'" *Rice-Peterson*, 2013 WL 1250457, at *8 (quoting *Gray v. Mut. Of Omaha Life Ins. Co.*, No. 11-15016, 2012 WL 2995469, at *3 (E.D. Mich. July 23, 2012)). This is true even if the plan contains discretionary language, since such provisions are void. *Id.*; *see also Keane v. Lincoln Nat'l Life Ins. Co.*, No. 1:11-CV-656, 2012 WL 4127827, at *5 (W.D. Mich. Sept. 18, 2012) ("Although the Policy contains language granting Lincoln National discretionary authority to construe the Policy's terms and to determine

eligibility, . . . the parties acknowledge that the proper standard of review in this case is *de novo*, in light of Michigan Administrative Code Rule 500.2202(b) . . . .").

The parties here agree that the *de novo* standard applies. (Doc. 12 at 16-17; Doc. 16 at Pg ID 802).[8] Plaintiff, after initially arguing that the arbitrary and capricious standard was proper (Doc. 13 at 13-14), has acknowledged that *de novo* review is appropriate. (Doc. 16 at Pg ID 802). I suggest that the parties have pointed to the proper standard: ERISA governs the Policy, its effective date was after July 1, 2007 (Doc. 10 at 30), and Seals resided in Michigan during the relevant period (Doc. 1 at 1).

The standard of review also implicates Seals's argument that Liberty operated under a conflict of interest by serving as both the decision-maker and potential payer on the claim. (Doc. 13 at 19.) This dual role can play a factor in the analysis when the court reviews under an arbitrary and capricious standard. *Bruch*, 489 U.S. at 115 ("Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" (quoting Restatement (Second) of Trusts § 187, Cmt. d (1959)); *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (same); *Morris v. American Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 981-82 (6th Cir. 2010) ("For ERISA purposes, a conflict of interest is present when the same entity both funds the plan and evaluates claims for benefits thereunder."); *Marks v. Newcourt Credit Gp., Inc.*, 342 F.3d 444, 457 (6th Cir. 2003) (same). As a factor, it does not reduce the deference owed under the arbitrary and capricious standard to a *de novo* standard, but rather provides a consideration to be given more weight when the circumstances suggest the conflict skewed the decision. *Glenn*, 554 U.S. at 115-17; *see also Maleszewski v.*

---

[8] Plaintiff's response brief lacks internal pagination, so all citations to it refer to the CM/ECF numbering system.

28

*Liberty Life Assurance Co. of Boston*, No. 09-13926, 2010 WL 1416995, at *2 (E.D. Mich. Apr. 8, 2010). And it is "less important" where the administrator took action to diminish the possibility that bias would affect the decision. *Glenn*, 554 U.S. at 117.

However, the existence of a conflict is irrelevant when the *de novo* standard applies, and in such cases it no longer serves as a useful factor in the analysis. *See, e.g.*, *McKenna v. Aetna Life Ins. Co.*, No. 13-12687, 2014 WL 1389050, at *2 (E.D. Mich. Apr. 9, 2014) ("[A]n alleged conflict of interest is irrelevant under de novo review . . . ."); *Keane*, 2012 WL 4127827, at *6 (noting that the *de novo* standard rendered the plaintiff's conflict argument "irrelevant"); *Mulligan v. Provident Life & Accident Ins. Co.*, 271 F.R.D. 584, 588 n.5 (E.D. Tenn. 2011) ("An administrator's conflict of interest is relevant only if the administrator's decision is to be reviewed under the arbitrary and capricious standard of review."); *McCollum v. Life Ins. Co. of North America*, No. 10-11471, 2010 WL 5015394, at *2 (E.D. Mich. Dec. 3, 2010) ("Where the court will review the record *de novo*—rather than for abuse of discretion—the relevance of discovery regarding conflicts of interest is vanishingly minute."); *Price v. Hartford Life & Accident Ins. Co.*, 746 F. Supp. 2d 860, 866 (E.D. Mich. 2010) ("If the standard of review is *de novo*, then the significance of the administrator's conflict of interest evaporates."). Here, Seals presented the conflict argument in his initial brief, which espoused the arbitrary and capricious standard. The response brief, acknowledging the *de novo* standard applies, does not address this issue, so his desire to proceed with this argument is uncertain. In any case, the conflict is not a factor in this *de novo* review.

    **b.**    **Arguments and Analysis**

        *1.*    *The Need for Objective Evidence*

The parties provide diverging interpretations of the Policy's definition of "Proof," with Liberty arguing that it required Seals to submit objective evidence (Doc. 12 at 21-23) and Seals arguing it had no such mandate (Doc. 16 at Pg ID 802-05). Seals simply contends that "[n]othing in this definition states that an employee must produce objective evidence that substantiates injury or illness." (*Id.* at Pg ID 803.) For its part, Liberty relies on *Boone v. Liberty Life Assurance Co. of Boston*, 161 F. App'x 469 (6th Cir. 2005), which it says examined the "identical" policy as in the present case and found the language required objective evidence. (Doc. 12 at 21-23.)

Though somewhat ambiguous, Liberty does not seem to argue that Seals lost his claim simply because he failed to submit any evidence in an objective form; rather it appears that Liberty is contending that Seals did not offer any objective evidence which actually proved his disability. (Doc. 17 at 5-7.) In other words, the evidence that Seals did submit failed to show he was disabled. As it states in its reply brief, "virtually all of the objective and clinical medical evidence concerning Mr. Seals's physical and mental conditions confirmed his ability to return to work." (Doc. 17 at 4-5.) And when Liberty addresses how Seals failed to "submit objective medical or clinical evidence," it discusses why the MRIs he did submit were not persuasive. (*Id.* at 5.)

Therefore, Liberty's contention that the Policy requires objective evidence is somewhat beside the point as it does not contest the types of evidence Seals submitted but rather what that evidence proves. Conversely, Seals's argument that the Policy lacks this requirement is also misdirected. He claims that "Liberty, under its own Plan, could not deny [long-term] benefits simply because Mr. Seals was unable to provide objective medical evidence of his disability." (Doc. 16 at Pg ID 805.) This does not appear to concede the lack of objective evidence, but

30

rather attacks Liberty's interpretation of the term "Proof." In any case, Seals misunderstands the overall structure of the Policy: He must produce evidence of his disability. Absent sufficient evidence, Seals could not be found disabled, and it is hard to imagine how he could sustain his case with subjective evidence alone, regardless of what the Policy requires.

The real dispute centers on whether the evidence suffices to show he met the Policy's disability standard, not whether the evidence came in properly objective forms. Arguing this issue through the overlay of an interpretive dispute over "Proof" adds unnecessary complication.[9] Had Seals not submitted anything in an objective form, but instead solely relied on his subjective complaints, then his compliance with "Proof" might have been more central. But when Liberty complains here that Seals failed to offer objective evidence, it means that the MRIs and other objective evidence do not prove disability.[10]

_____

[9] Seals's reply brief further confuses the interpretation of "Proof." (Doc. 18 at Pg ID 833-34.) He argues that the Policy does not define "objective medical evidence" and, as a result, Liberty has "suggest[ed] the definition of 'proof' should be used in this action." (*Id.* at Pg ID 833.) He asks that the "court . . . not allow the Defendant to apply a term of art, such as 'proof,' to an unrelated, and far more specific term of art, 'objective medical evidence,' without any previous instruction in the Administrative Record on the issue." (*Id.*) But "Proof" is the operative contractual, and it is certainly related to the term "objective medical evidence," which forms a part of the definition of "Proof." The parties are instead disputing, unnecessarily in this case, whether objective evidence is a mandatory part of "Proof's" definition or whether it is merely illustrative. Further, "Proof" is defined in the contract—it is not used as a term of art. And while "objective medical evidence" remains technically undefined, it set out in a readily interpretable format, as it is preceded by more specific "companions" that give it meaning. *See, e.g.*, *McBoyle v. United States*, 283 U.S. 25 (1931).

[10] To the extent the parties are disputing the Policy's meaning, a brief examination reveals that it is less straightforward than either side suggests. General contract rules, including interpretive standards, apply to ERISA plan documents, which should be interpreted according to their ordinary meaning. *Miller v. Hartford Life Ins. Co.*, 348 F. Supp. 2d 815, 817 (E.D. Mich. 2004) (citing *Marquette Gen. Hosp. v. Goodman Forest Indus.*, 315 F.3d 629, 633 (6th Cir. 2003)). In defining "Proof," Liberty's Policy used a well-known and well-interpreted format. It begins with a preamble provision defining "Proof" as "evidence in support of a claim for benefits . . . ." (Doc. 10 at 39.) Then, it says that such evidence "includes, but is not limited to, the following" three subparts, all linked by the conjunctive "and." (*Id.*) The final subpart is the disputed provision here: "forms of objective medical evidence in support of a claim for benefits." (*Id.*) The usual interpretive difficulty with textual definitions in which "includes" precedes an enumerated list is determining whether the enumerated list is exhaustive. That is not quite the same question presented here, as the text plainly asserts that the list is non-exhaustive. The question here is whether the enumerations represent mandatory terms or are merely illustrative. Nonetheless, the case law is helpful here as well.

Facing similar arguments, courts have rejected the emphasis Liberty places on its objective evidence provision when interpreting the Policy. True, in *Boone* the Sixth Circuit suggested that the plan requires objective evidence, though the court did not recite or discuss the preamble; the only portion of the policy quoted was the objective evidence provision. *Boone*, 161 F. App'x at 472. Agreeing with Liberty's decision in that case to disregard the opinions of the claimants' physicians, the court suggested that Liberty's analysis was proper because the opinions "were not supported by objective medical evidence, which is what the plan requires. *Id.*

---

The dictionary definition of "include" indicates that it precedes a "partial list." **Error! Main Document Only.**Black's Law Dictionary 631 (Abridged 8th ed. 2005); *see also Fowler's Modern English Usage* 387 (R.W. Burchfield, ed., 3d ed. 1996) ("[G]ood writers say *comprise* when looking from the point of view of the whole, *include* from that of the part."). Accordingly, "the Supreme Court of the United States has explained 'that the term "including" is not one of all-embracing definition, but connotes simply an illustrative application of the general principle.'" *Trustees of Laborers Pension Trust Fund-Detroit & Vicinity v. Metallizers of Mid-America, Inc.*, No. 13-14874, 2014 WL 4059864, at *4 (E.D. Mich. Aug. 14, 2014) (quoting *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941)); *see also Samantar v. Yousuf*, 560 U.S. 305, 317 (2010) ("It is true that use of the word 'include' can signal that the list that follows is meant to be illustrative rather than exhaustive."); *United States v. Best*, No. 5:11-cr-00414, 2012 WL 3027544, at *4 (N.D. Cal. July 24, 2012) ("[T]he only interpretation which passes muster under the rules of statutory construction is one which classifies [the phrase 'including but not limited to'] as an illustrative list rather than an exclusive definition."). Under this interpretation, the enumerated items are seen as examples meeting the general definition rather than as necessary elements *comprising* the general definition. *Fowler's*, *supra* at 387 ("With *include*, there is no presumption . . . that all or even most of the components are mentioned; with *comprise*, the whole of them are understood to be in the list."); *Uyeshiro v. Irongate Azrep BW LLC*, No. 13-00043, 2014 WL 1233109, at *6 (D. Ha. Mar. 24, 2014) ("In this context, the use of the term 'including' appears to be in accordance with its customary meaning, and thus may be interpreted as preceding illustrative (rather than exhaustive) examples of restrictions on unit uses."). As the Tenth Circuit said of one insurance policy, "the three acts following the word 'including' are simply illustrative examples of some of the types of employment-related practices not covered under the policy." *Moroni Feed Co. v. Mut. Serv. Cas. Ins. Co.*, 287 F.3d 1290, 1293 (10th Cir. 2002). This suggests that the enumerated items in the Policy here are examples of the types of evidence Seals could have submitted, rather than items he needed to provide to prevail.

The text offers countervailing suggestions that these items are necessary elements, regardless of the unenumerated items that the definition could include. First, each item is connected by "and," which indicates that all are needed to comply with the definition. Additionally, almost the entire list contains specific items—a form signed by the claimant's physician and an attending physician's statement—that would not be included here if the claimant could ignore them as mere examples. The only other item is the disputed objective evidence provision, and it would seem nearly impossible for a claimant to prevail without such materials.

at 473. Other courts addressing the same language—including the preamble—have suggested implicitly that the Policy mandates objective evidence. *See Pierzynski v. Liberty Life Assurance Co. of Boston*, No. 10-14369, 2012 WL 3248238, at *1-2, 4-5 (E.D. Mich. Aug. 8, 2012) (distinguishing *Boone* because the plaintiff offered objective evidence); *see also Patrick v. Hartford Life & Accident Ins. Co.*, 543 F. Supp. 2d 770, 778 (W.D. Mich. Mar. 4, 2008) (noting that the *Boone* policy "*required* objective evidence").

More recently, courts have interpreted the Policy's definition of "Proof" as providing a non-exhaustive list of examples. In *James I*, the court concluded that the "definition does not require all evidence to be objective; it simply includes 'objective medical evidence' as one category of 'proof.'" 984 F. Supp. 2d at 739. Regardless, the court found that the claimant had produced objective evidence, including MRIs and physical assessments by physicians corroborating the subjective complaints. *Id.* The objective evidence of depression consisted of the psychiatrist's clinical observations and examinations, along with the Beck Depression Inventory. *Id.* at 739-40.

In affirming, the Sixth Circuit squarely addressed the Policy language:

> James produced ample subjective and objective evidence that she was unable to return to work. Throughout its argument, Liberty Life stresses the lack of objective evidence produced by James and the requirement of such evidence under the Policy. However, the Policy does not require the claimant to *only* produce objective evidence. Under the plain language of the Policy, proof "includes, but is not limited to . . . forms of objective medical evidence." Therefore, evidence beyond the enumerated categories that Liberty Life considers is allowable to substantiate a claim of disability under the Policy.

*James II*, 582 F. App'x at 589. The court went on to note that the plaintiff fulfilled her obligations under the Policy's definition of "Proof" by producing "MRIs, records of her physical examinations, chart notes, lab and other test results, and physician diagnoses . . . ." *Id.* at 590. Further, it explained that psychiatric impairments are less susceptible to objective confirmation.

33

*Id.* at 589. Finally, it cited case law establishing that administrators must consider subjective evidence unless they have a "basis for believing the evidence is unreliable." *Id.* Other courts have likewise found that claimants under the Liberty Policy have submitted objective evidence despite Liberty's strenuous arguments to the contrary. *See, e.g.*, *Pierzynski*, 2012 WL 32482238, at *5.

I suggest that Seals has produced evidence qualifying as "Proof" under the Policy, but stress that this conclusion says nothing of the evidence's ultimate persuasiveness. The policy lists as objective evidence physician diagnoses, chart notes, lab findings, test results, and x-rays. (Doc. 10 at 38.) All of these appear in the record in one form or another, including CT scan results (*id.* at 245, 250, 555-57), diagnosis forms (*id.* at 303, 308, 595, 608-10), chart notes with descriptions of testing and diagnostic results (*id.* at 554-57, 587, 589-91), notes from Dow's medical staff (*id.* at 298-99), physical examination results (*id.* at 402, 550-52, 581-82, 587-88), a neurological evaluation (*id.* at 561-65), physical and occupational therapy records (*id.* at 379-400, 404-65), and actual MRIs (*id.* at 334-35, 340-41). As for objective psychiatric evidence, the record contains the same Beck Depression Inventory test found sufficient in *James I*. (*Id.* at 565.) As the Sixth Circuit noted, "psychiatric opinions are inherently subjective." *James II*, 582 F. App'x at 589. In a related context—Social Security disability—courts have also recognized that "'psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing,'" thus "'[w]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of diagnoses and observations of professionals trained in the field of psychopathology.'" *Sanchez v. Apfel*, 85 F. Supp. 2d 986, 992 (C.D. Cal. 2000) (quoting *Christensen v. Bowen*, 633 F.Supp. 1214, 1220–21 (N.D.Cal.1986)); *cf. Russell v. Astrue*, No. 1:09-cv-01919, 2011 WL 1595982, at *15 (E.D. Cal. Apr. 27, 2011) (noting that the treatment

notes did not "document any objective evidence of depression or anxiety, such as administration of any psychological tests, or even observations of Plaintiff's demeanor"). Thus, Dr. Ingram's notes also provide proof as objective as possible in this area.

### 2. File-Only Reviews

Seals's arguments focus on Liberty's file-only review of the record, touching upon various devices the courts use to analyze evidence in ERISA claims. (Doc. 13 at 15-19; Doc. 16 at Pg ID 803-06.) Seals contends that Liberty's file-reviews suffered various flaws. (Doc. 13 at 16, 18.) First, they contradicted all of his treating physicians, who invariably found him disabled. (*Id.*) Additionally, the reviews examined irrelevant matters, such as Dr. Sugerman's observation that Seals was not appreciably more depressed after September 17, 2012 than before. (*Id.*; Doc. 16 at 805.) Compounding the errors, Seals asserts that Dr. Sugerman "[did] not even have a job description detailing the physical requirements of [Seals's] job." (Doc. 13 at 17.) The reviewers' bias is also apparent to Seals, based on sheer logic: "The more claims they deny for Liberty, the more likely these [sic] are to be hired again by Liberty. Certainly, these examiners are going to favor the party paying them nearly $800 to review some medical records." (*Id.*) Instead of file-only reviews, Liberty should have ordered physical examinations of Seals, especially because the reviews contradicted all available medical evidence. (*Id.* at 18-19.)

These contentions implicate case law on the deference owed to treating physicians, the need for physical examinations, and how to weigh non-examiner's opinions that contradict those from treating physicians. At base, however, all of the guidelines set out in the cases merely serve as tools for accurately analyzing the evidence and courts have not hesitated to go against them when the evidence requires. This applies particularly in the present case, where some of these devices may support Seals and others may not—the final determination therefore must be based

on a thorough review of the evidence in this case rather than wooden interpretation of the case law. Nonetheless, the guidelines orient the Court to this task.

The first relevant consideration Seals presents is the persuasiveness of his treating physicians. Without citation to any cases, he states, "Clearly, a doctor(s) who has treated and examined a patient in person over a long period of time is more equipped in making a determination and opinion than someone who is getting paid to conclude in favor of Liberty to ensure more work for them." (Doc. 16 at 806.) Liberty responds that treating physicians are not entitled to any particular deference, so crediting consultants is not an error. (Doc. 17 at 8.) Neither side captures the nuances in the case law.[11]

As a general matter, treating physicians do not receive special deference in ERISA cases. *Nord*, 538 U.S. at 834. In *Nord*, the Supreme Court declined to apply the treating physician rule from the Social Security disability program to ERISA cases. That rule requires the Administration to "give more weight to opinions from . . . treating sources" or provide "good reasons" for not doing so. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The Court held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Nord*, 538 U.S. at 834. In coming to this conclusion, the Court observed that while a treating physician may be more familiar with the patient's condition, granting them deference "may make scant sense" in a variety of circumstances, such as when the relationship was relatively brief or the physician is contradicted by a specialist consultant with greater

---

[11] Despite applying *de novo* review, case law using the arbitrary and capricious standard is persuasive in examining the evidence. *See James I*, 984 F. Supp. 2d at 737 (citing *Pierzynski*, 2012 WL 32482238, at *4).

expertise. *Id.* at 832. Thus, courts will not accord a treater's opinion greater weight without reason. *See Calvert*, 409 F.3d at 293.

While courts cannot require administrators to credit treating physicians as a matter of course, a few have found in discrete cases that the treater's opinions were weightier "because, as treating physicians, [they] . . . were in the best position to observe changes in . . . symptoms and assess potential malingering," and because they had an extended view of the claimant's ability to cope." *James I*, 984 F. Supp. 2d at 737. The Sixth Circuit upheld this observation as a factor the district court properly used in its analysis, noting that it was not determinative. *James II*, 582 F. App'x at 586-87. Moreover, the usual arbitrary and capricious review standard would preclude an administrator from summarily disregarding a treating opinion for an alternative opinion without providing an explanation. *See Gillespie v. Liberty Life Assurance Co. of Boston*, 567 F. App'x 350, 353 (6th Cir. 2014); *Elliot v. Metro. Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006); *Rice-Peterson*, 2013 WL 1250457, at *9. An acceptable reason for disagreeing with the opinion could be that it lacks supporting objective evidence, *see Morris*, 399 F. App'x at 986-87; *Curry*, 400 F. App'x at 59; *Rice-Peterson*, 2013 WL 1250457, at *9, or, the treating sources may lack expertise in the relevant field, *see Simpson v. Liberty Life Assurance Co. of Boston*, No. 06-11077, 2007 WL 2050428, at *4 (E.D. Mich. July 17, 2007) (adopting Report & Recommendation).

A related but discrete issue is whether the administrator must generally credit the opinions of examiners over non-examiners. The Sixth Circuit has distinguished the argument that examiners deserve greater weight from the claim rejected in *Nord* that treating physicians automatically receive deference. *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005). In general, where a policy allows for examinations,

37

administrators are under no obligation to order them and can instead rely on file-only reviews. *See Elliot*, 473 F.3d at 620-21; *Calvert*, 409 F.3d at 295. Indeed, thorough file reviews can support an administrator's decision to deny benefits. *See Whitaker*, 404 F.3d at 950. The "five independent peer-review doctors' reports" in *Breland v. Liberty Life Assurance Co. of Boston* satisfied the court that the administrator's benefits denial was well-supported. No. 14-CV-10508, 2015 WL 1132948, at *11-13 (E.D. Mich. Mar. 12, 2015). The reviewers adequately explained why they disagreed with the treating physicians and, additionally, nothing indicated they disregarded evidence. *Id.* The same considerations convinced the court in *Serra v. Liberty Life Assurance Co. of Boston* to accept Liberty's use of consulting opinions that contradicted treating opinions. No. 08-10825, 2009 WL 2222856, at *3-4 (E.D. Mich. July 23, 2009). The reviewer's opinion there acknowledged the conflicting opinions and explained its recommendations, and the court also noted that the treating physicians' opinions lacked support. *Id.*

Nor is there any requirement that the reviewer be a physician. The Sixth Circuit explained that it had "never held that a plan administrator must hire a physician to undertake an independent review of an applicant's records before denying benefits," and pointed to a decision upholding the administrator "where a nurse reviewed the medical evidence." *Boone*, 161 F. App'x at 474 (citing *Wages v. Sandler, O'Neill & Partners, L.P.*, 37 F. App'x 108, 110 (6th Cir. 2002)). Because the plaintiff did not explain why a doctor, but not a nurse, could have interpreted the medical record, the court rejected the argument that physician review was necessary. *Id. See also Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013) (holding that the administrator did not act arbitrarily or capriciously by using a nurse to review the evidence).

Nonetheless, the case law reflects the flexibility needed when interpreting complex and variable medical evidence. Therefore the Sixth Circuit allows reviewing courts to consider, as factor, whether an examination occurred. As the court stated,

> while Liberty's reliance on a file review does not, standing alone, require the conclusion that Liberty acted improperly, we find that the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.

*Calvert*, 409 F.3d at 295. *See also Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554-55 (6th Cir. 2008) (applying *Calvert* and finding reliance on file-reviews unreasonable); *Scofield v. Liberty Life Assur. Co. of Boston*, No. 1:12-CV-200, 2013 WL 5442778, at *5-8 (W.D. Mich. Sept. 30, 2013) (same). One relatively straightforward application of this rule is that medical reviews are suspect when they include credibility determinations from reviewers who never examined the claimant. *Judge*, 710 F.3d at 663 ("This court has found fault with file-only reviews in situations where the file reviewer concludes that the claimant is not credible without having actually examined him or her."); *Bennett*, 514 F.3d at 555-56 ("[W]e will not credit a file review to the extent that it relies on adverse credibility findings when the files do not state that there is reason to doubt the applicant's credibility.").

Additionally, the review—and, of course, the ultimate denial—must apply the correct disability standard laid out in the plan. Thus a reviewer's conclusion that the claimant might be able "to return to some type of gainful employment" does not necessarily entail denying his claim if, as here, the plan offers a more specific definition of disability. *See, e.g.*, *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 170-71 (6th Cir. 2003) (noting that simply finding the claimant "might be able to return to work under certain limited circumstances" does not suffice); *see also Judge*, 710 F.3d at 658-59 (finding that the denial letter applied the correct

39

standard despite using "shorthand jargon"); *Kalish*, 419 F.3d at 506 ("Although the fact that a claimant is able to engage in sedentary work is an appropriate consideration in some cases, the Plan language in the present case explicitly stated that a participant is disabled so long as" he cannot substantially perform the duties of his occupation).

The concern animating cases rejecting a file-only review is not simply that no examination took place, but that the reviews suffered as a result. In expounding on why file-only reviews were inappropriate, the courts focused on the deficiencies in the reviews. In *Calvert*, for example, the non-examining reviewer reached conclusions that were "incredible on their face," ignored a Social Security Administration disability determination, failed to explain contrary physician opinions, disregarded objective evidence while claiming there was none, and made credibility determinations. 409 F.3d at 296-97. The reviewer in *Bennett* likewise left unmentioned a Social Security disability decision, implied that the claimant was malingering despite the treating physician's direct denial that this was the case, and made internally contradictory findings. 514 F.3d at 554-56. In *Scofield*, the reviewers insufficiently justified their conclusions, failing to explain contradictions with treating sources, mischaracterizing the objective evidence, and mistaking facts in the record. 2013 WL 5442778, at *5-8. *See also Kalish*, 419 F.3d at 508-11 (rejecting a reviewer's opinion where he ignored evidence and applied incorrect standards). Where these defects do not mar the analysis, courts have upheld file-only reviews. *See, e.g.*, *Judge*, 710 F.3d at 663 (finding no concerns where the nurse reviewers did not make credibility determinations, echoed the findings of the claimant's doctors, noted "internal inconsistencies," and noted where the reports lacked objective evidence); *Serra*, 2009 WL 2222856, at *3-4 (finding the review was acceptable because it acknowledged contrary opinions and explained why they were unpersuasive).

40

Context matters when addressing the need for examinations, and consequently examinations may be more important where the claimant alleges mental health impairments. One court noted that "many courts have expressed skepticism about claim denials in psychiatric disability cases that rely solely on file reviews . . . ." *James I*, 984 F. Supp. 2d at 737. The prevalence of this practice in ERISA cases is uncertain. In support, the *James I* court cited only *Smith v. Bayer Corp. Long Term Disability Plan*, 444 F. Supp. 2d 856, 873 (E.D. Tenn. 2006), *vacated in part on other grounds by* 275 F. App'x 495 (6th Cir. 2008), which in turn relied on a block quote from *Sheehan v. Metro. Life Ins. Co.*, 368 F. Supp. 2d 228, 254-55 (S.D. N.Y. 2005). None of the four opinions cited in *Sheehan* came from ERISA cases, or even other disability benefits cases, but were instead from criminal contexts.[12] *Id.* However, another case concluded that "[t]here can be no serious doubt that a psychiatric opinion based on a face-to-face interview with the patient is more reliable than an opinion based on a review of a cold, medical record." *Westphal v. Eastman Kodak Co.*, No. 05-CV-6120, 2006 WL 1720380, at *5 (W.D. N.Y. June 21, 2006). Whatever the frequency of rejections of non-examining psychiatric reviews, the underlying notion that personal examination produces better results seems sound and is reflected in general psychiatric practices. *Id.*

Bringing together these various strands, courts have frequently dealt with an administrator's decision that credits a non-examiner's opinion over a treating physician's. Despite the standards described above—that the treating physician's opinion does not merit automatic deference and that examinations are generally unnecessary—courts have not hesitated to find fault with such a decision. *See Bennett*, 514 F.3d at 554-56 (noting that reviewers did not adequately explain why they reached decisions contrary to the Social Security Administration's

---

[12] *Rollerson v. United States*, 343 F.2d 269 (D.C. Cir. 1964); *Jones v. United States*, 327 F.2d 867 (D.C. Cir. 1963); *Campbell v. United States*, 307 F.2d 597 (D.C. Cir. 1962); *People v. Espinoza*, 116 Cal. Rptr. 2d 700 (Cal. Ct. App. 2002);

and the treating physicians'); *Elliott*, 473 F.3d at 620 ("However, that MetLife gave 'greater weight' to a non-treating physician's opinion for no apparent reason lends force to the conclusion that MetLife acted arbitrarily and capriciously."); *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381-82 (6th Cir. 2005) (rejecting administrator's opinion where the only opinion contrary to the treating source's was a reviewer's based on "a selective review of the administrative record"); *McDonald*, 347 F.3d at 170-72 (finding that administrator erred by relying on non-examiners who disagreed with treating physicians where the non-examiners' analyses were defective); *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 807-09 (6th Cir. 2002) (affirming district court's reversal of benefit denial where the only evidence contradicting the treating opinion were three non-examiners whose credentials and specializations were not in the record); *Counsell v. Liberty Life Assurance Co. of Boston*, No. 08-14236, 2010 WL 1286695, at *6 (E.D. Mich. Mar. 31, 2010) (holding that the denial was arbitrary and capricious where it contradicted the treating opinions in favor of non-examiners and where the record evidence as a whole supported disability).

Again, however, these decisions were based on the facts at hand and often revolved on the reviewer's feeble analysis, as in *Bennett*. As the Sixth Circuit said in *Judge*, its holdings had "discounted a file review when the plan administrator, *without any reasoning*, credits the file reviewer's opinion over that of a treating physician." 710 F.3d at 663 (emphasis added). For example, the reviewer in *Elliot* simply recited prior findings made by the administrator, did not rebut the treating doctor's opinion, and gave no "reasoned evaluation of [the claimant's] condition to determine whether she could perform [her job] duties." 473 F.3d at 619. Likewise in *Counsell* the court found that the administrator had overlooked evidence supporting the claimant. 2010 WL 1286695, at *6. Thus these decisions are compelled by the underlying facts and not

42

obeisance to the notion that treating physicians trump non-examining reviewers. "Generally," the Sixth Circuit has observed, "when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon evidence, for the plan administrator's decision." *McDonald*, 347 F.3d at 169. Relying on supporting opinions over contrary evidence proves unreasonable only where those supporting opinions are themselves deficient or some other errors have occurred. *See, e.g.*, *Burge v. Republic Engineered Prods., Inc.*, 432 F. App'x 539 (6th Cir. 2011) (noting that numerous doctors opined the claimant could return to work but finding that the denial was arbitrary because the defendant failed to apply the correct standard, inconsistently reverted between different plans, and ignored evidence); *Elliott*, 473 F.3d at 621 n.6 (noting that an administrator generally can rely on a medical opinion, but stating that the "rule is no absolute, particularly where, as here, there is so little evidence of a process that reasons from the patient's condition to her work ability"); *Moon*, 405 F.3d at 381-82 (finding that the only medical opinion contrary to the treating physician's was insufficient because it was based on "a selective review of the administrative record").

A final consideration when dealing with consulting reviewers is that bias might infect their opinions. The Supreme Court has acknowledged that consulting physicians repeatedly retained by administrators for record review may have an incentive to recommend denying applications in order to save their employer money. *Nord*, 538 U.S. at 832. Of course, a consultant who recommended denials even where the evidence pointed strongly in the other direction would invite litigation and therefore not save the administrator's resources and, further, endanger his own job prospects by having his opinions constantly called into question in court.

Nonetheless, the incentive to placate the employer is real and courts accordingly consider it as a factor when addressing a reviewing opinion. The Sixth Circuit has "observed that a plan administrator, in choosing independent experts who are paid to assess a claim, is operating under a conflict of interest that provides it with a 'clear incentive to contract with individuals who were inclined to find in its favor that [a claimant] was not entitled to continued [disability] benefits." *Kalish*, 419 F.3d at 507-08 (quoting *Calvert*, 409 F.3d at 292); *see also Maleszewski*, 2010 WL 1416995, at *2 (noting the incentive as a conflict of interest factor).

Simply because the reviewer might be biased does not mean he actually skewed his opinion as a result. The Sixth Circuit has therefore sought actual evidence that the reviewer's theoretical partisanship had practical effect in the case. In *Kalish*, for example, the court noted that the allegations of bias were "conclusory" and the claimant did not seek to bolster them with, for example, "any statistical evidence to suggest that, when retained by Liberty, [the review] has consistently opined that claimants are not disabled." 419 F.3d at 508. "In the absence of such evidence," the court continued, "we are unable to conclude on this basis that Liberty acted arbitrarily and capriciously" *Id.*; *see also Agin v. Liberty Life Assurance Co. of Boston*, No. 1:05-CV-589, 2006 WL 1722228, at *14 (W.D. Mich. June 21, 2006) (noting that the allegations of bias were unfounded). Further, the court questioned whether there was a structural conflict of interest because the reviewer "was not an employee of Liberty. Rather, he was an independent expert retained by Liberty to conduct a peer review of the work of" the claimant's file. *Kalish*, 419 F.3d at 507. Finally, a less noted bias is the treating physician's potential propensity to favor his client-patient and find a disability. The Supreme Court stated that "a treating physician, in a close case, may favor a finding of 'disabled.'" *Nord*, 538 U.S. at 832; *see also Agin*, 2006 WL 1722228, at *14.

At base, all of the standards set out above were crafted with an eye towards enabling the most accurate analysis of the evidence. Courts apply them with flexibility and an understanding that the evidence must determine disability, not generalized standards. Thus, for example, in *Burge v. Republic Engineered Products, Inc.*, the court recited the rule that the defendant could rely on one opinion over others, but found that the evidence and defendant's lackluster review— which ignored evidence and applied incorrect standards—required remand. 432 F. App'x at 540. Even when the standards are applied, the courts are quick to note that the determinative factor is underlying evidence. In affirming the *James I* decision, which stated that the lack of an examination was a factor in reversing the denial, the Sixth Circuit noted that the district court's reliance on this factor "was not determinative for the court on discounting the file reviewers' opinions." *James II*, 582 F. App'x at 587. "[T]he [district] court's explicit reason for giving less weight to the file reviewers' opinions was that they took piecemeal approaches to their evaluations." *Id.*

### 3.    Analysis

With these factors in mind, I suggest that though the review process here was not perfect in every minute detail, a preponderance of the evidence supports the reviewers' conclusions and also Liberty's final denial of benefits. The medical record simply does not support a finding of disability. The following addresses the treating sources and file-only review process, as well as the totality of the medical evidence.

Contrary to Seals argument, his treating sources do not offer overwhelming support for his disability claim. The form opinions they provided early in the claim process do not fully capture the evidence they considered or reflect the development of their recommendations. Dr. Nahata opined in November 2012 that for the following six months Seals would have various

45

functional limitations due to his back spasms and mood disorder, and as a result he could not work. (Doc. 10 at 303-06.) In particular, Seals could not stand or sit for longer than one hour at a time, or for more than two to three hours during the day. (*Id.* at 303, 306.) Seals's other limiting impairments related to his anxiety and depression. (*Id.* at 305.)

An initial difficulty with crediting the severe restrictions in Dr. Nahata's first opinion is that the record does not indicate he has any experience with psychiatric disorders. *See Nord*, 538 U.S. at 832 (noting that a treating physician's opinion could be overcome by a contradictory opinion by a specialist); *Hoover*, 290 F.3d at 807-09 (noting that the treating source's credentials were not in the record); *Simpson*, 2007 WL 2050428, at *4 (noting that an acceptable reason for rejecting a treating opinion is that the physician lacks expertise in the area). When he opined that Seals's abilities to focus and concentrate were impaired, he was aware of Dr. Schafer's conclusions to the contrary, which he described in his July 2012 treatment notes: Seals had "some mild depression and subjective cognitive complaints," but "no significant decline from his previous functioning." (Doc. 10 at 531.) Even before receiving the results from that testing, Dr. Nahata had cleared Seals to return to work. (*Id.* at 137.) After reviewing Dr. Schafer's report and examining Seals, Dr. Nahata himself thought in July 2012 that his depression and anxiety were mild and that he had "[n]o significant cognitive memory deficits . . . ." (*Id.*) Nothing in the session notes from July to November indicates that Dr. Nahata believed Seals's mental condition had so deteriorated that Dr. Schafer's report no longer reflected his current state. Consequently, this part of his opinion is unpersuasive.

Likewise, Dr. Nahata's ultimate opinion on Seals's physical, functional abilities is unclear. His November 2012 form forecasting six months of disability was preceded by a June 2012 form that said Seals could return to work. (*Id.* at 139.) As with the mental condition, the

notes between these two dates do not paint a picture of rapidly deteriorating health. In July, Seals reported his that physical therapy was helping, his back had only mild tenderness, and he had no strength or mobility deficits. (*Id.* at 551-52.) Despite his emergency room visit in August, the MRI from that month displayed only "very mild" stenosis, Dr. Nahata's examination found mild back strain and spasms, and Seals's strength was normal. (*Id.* at 587, 589-91.) The September examination was no different. Thus Dr. Nahata leaves unexplained what changed in this five month period to prevent Seals from working.

Further muddying the waters, Dr. Nahata's last formal limitations opinion, a "Restriction Form" from January 2013, indicates Seals could work at some level. (*Id.* at 537.) Specifically, he could complete sedentary work on a full-time basis. (*Id.*) It is not clear whether this would preclude him from returning to his former position as marketing manager, although that position's requirements appear to be sedentary. (*Id.* at 619; Doc. 17 at 10.) *Cf. Kalish*, 419 F.3d at 506 ("Although the fact that a claimant is able to engage in sedentary work is an appropriate consideration in some cases, the Plan language in the present case explicitly stated that a participant is disabled so long as" he cannot substantially perform the duties of his occupation). Indeed, nothing suggests Dr. Nahata knew what the position entailed, further diminishing his opinion's persuasiveness.

Finally, none of Dr. Nahata's notes from the spring of 2013 add weight to his opinion, to the extent the opinion recommended that Seals was disabled. The examination in March 2013 mirrored all others, finding normal strength, mobility, and only mild back strain, spasms, and tenderness. (*Id.* at 324.) Moreover, Dr. Nahata reviewed a recent MRI showing that Seals's degenerative disc condition, though still present, had "mildly improved" since the last results in August 2012. (*Id.* at 324, 334-35.) Thus not only had his condition not declined in relative terms

47

since he last worked, nothing shows that he was incapable of work at any point. Finally, Dr. Nahata's comments in these notes that Seals "will continue to be off work at this point" are not an unambiguous declaration that Seals was disabled. (*Id.* at 324, 327.) A host of semantic reasons cast doubt that the statement was an imperative that he remain off work rather than a declarative observation that this was the case. Regardless, it does not offer specific reasons why he could not work or specify discrete restrictions he would labor under. Dr. Nahata's records and opinions therefore do no sufficiently support Seals's disability claim.

Dr. Pruitt's opinions and records suffer even greater deficiencies. First, as noted above, it seems that she works with Seals's uncle, who had also treated Seals. This raises the possibility of treating physician bias, though nothing in the record shows that she was unduly solicitous of Seals's application as result of her possible connection to him. *See Nord*, 538 U.S. at 832; *Kalish*, 419 F.3d at 508.[13] In any case, her opinion fails to persuade on other grounds. She offered three opinion statements, both stating Seals could not work and both largely premising this conclusion on his mental condition. (*Id.* at 178, 308, 322.) In November 2012, her form indicated that he was indefinitely disabled due to his PTSD, anxiety, depression, visual disturbances, headaches, and cognitive impairments including short-term memory loss. (*Id.* at 308.) An accompanying sheet was even less specific, simply repeating in answer to every question that Seals was under "Full Restriction" or "Full Limitation" indefinitely." (*Id.* at 178.) The second opinion came in an unaddressed letter that cites his "strong pain medications," back pain, and cognitive issues as reasons why he had not been able to work. (*Id.* at 322.) The third opinion form is also underwhelming and does not clearly state whether Seals could work or what

---

[13] Plaintiff does not appear to rely on his uncle's opinion form indicating he cannot work, but the potential for bias there is more apparent. (*Id.* at 135.)

his limitations were. (*Id.* at 542.) Instead, she left the portion covering his exertional abilities blank and simply referred to Dr. Ingram's and Dr. Nahata's notes. (*Id.*)

As with Dr. Nahata, Dr. Pruitt appears to lack expertise in psychiatric treatment methods or cognitive neuroscience. In fact, Dr. Pruitt plainly admits that she could not manage Seals's depression, so she referred him to a psychiatrist, Dr. Ingrahm. (*Id.*) The value of her opinions is therefore significantly diminished in light of the fact that she relied almost entirely on Seals's mental impairments to support his disability. Indeed, the first time she labeled Seals disabled, in her treatment notes, it was specifically "due to cognitive delay and mood disorder [sic]." (*Id.* at 545.)

Similarly, the discussions in her notes of Seals's physical impairments fail to prove his functional capacity precluded returning to his job. In the months following the 2012 accident, her treatment records reveal unremarkable physical examinations. (*Id.* at 534-44, 547.) Tellingly, during the September 2012 session immediately preceding his departure from work, Seals appeared alert and oriented, with normal judgment, attention, concentration, and insight, and no difficulties walking despite some pain in his lumbar. (*Id.* at 545.) Dr. Pruitt's mere observation of his depression and anxiety prompted her to conclude he was disabled. (*Id.*) But by the next month she was encouraging him "to get his education upgraded and start another career." (*Id.* at 546) And Seals denied a list of physical symptoms during that session, including general weakness and fatigue. (*Id.*) The extensive physical examination the following month found his range of motion was normal, and mentally he could maintain a normal attention span and sufficiently concentrate. (*Id.* at 550.) Apparently, she concluded his cognitive condition had continued to decline, which manifested as a lack of judgment presumably exemplified by the story he related that month of needlessly spending thousands of dollars on furniture. (*Id.*) Her

recommendations in those notes had nothing to do with any physical impairment. I thus suggest that her opinions on his disability do not provide persuasive evidence on either his mental state, which she lacked the expertise to assess, or his physical state, with which she seemed mostly unconcerned in her records.

Dr. Ingram's opinion also fails to sustain Seals's case. One of the critical questions on the form he filled out asked how Seals's symptoms affect his "ability to function in a work setting." (*Id.*) Dr. Ingram's responding by noting that Seals reported crying and feeling depressed. (*Id.*) This does not provide useful information to compare his current abilities with the demands of his job. And Seals's reports of crying fluctuated in the record, as he denied crying spells to Dr. Pruitt in December 2012 when he nonetheless claimed that his mental condition had deteriorated. (*Id.* at 549.)

Significantly, Dr. Ingram's form opinion and treatment notes did not clearly indicate Seals was disabled. (*Id.* at 530, 608-10.) Asked "[w]hat kind of work settings can the patient perform in, at this time, despite [his] limitations," Dr. Ingram replied, "Unknown." (*Id.* at 609.) Dr. Ingram's notes are similarly equivocal. At their first session, he said that "it may not be an option for [Seals] to return to his previous [work] level," but nonetheless he would "respect whatever Seals's wishes or desires were . . . ." (*Id.* at 530.) The problem with Seals returning to work, Dr. Ingram suggested, was his "neuropsychological" test results: "[I]n terms of neuropsychological testing I cannot give a good estimate about long-term probability returning [sic] to work." (*Id.*)

Aside from Seals's subjective complaints, the only apparent basis in the notes that supports this conclusion is Seals's inability "to recall one out of three items after five minutes." (*Id.*) Yet this lone test fails to overcome the clear outcome from Dr. Schafer's thorough

neuropsychological testing completed just a few months prior. (*Id.* at 561-65.) As noted, she found his cognitive functioning to be average or above average across a host of tests. (*Id.*) Dr. Schafer's report offers the most detail on Seals's mental condition and stands unrebutted by other objective evidence.

Dr. Ingram's remaining notes from 2012 do not support disability. Throughout most of them, Seals characterized his depression as "mild," despite claiming other worsening symptoms. (*Id.* at 510-11, 523.) Another indication that Seals's depression was not disabling is his apparent failure to follow Dr. Ingram's or Dr. Schafer's advice to seek psychotherapy, even though the former "felt it was mandatory" that he receive "some type of therapy at this time." (*Id.* at 510, 565.) The file's only mention of therapy sessions came in the March 2013 emergency room visit, treating his depression (*id.* at 393), and during his subsequent appointment with Dr. Nahata, when Seals said he had entered into an inpatient program at a psychiatric unit. (*Id.* at 324.) Corroborating records are not in his file and, in any case, it could not have been an extensive treatment: He went to the hospital on March 10 and spoke with Dr. Nahata on March 14, presumably after he had completed the treatment. The emergency room visit provides the most persuasive evidence favoring Seals's claim, yet I suggest that it alone does give sufficient proof of disability.

Despite a few potential issues, Dr. Sugerman's review of the psychiatric record adequately addressed the evidence. First, unlike the cases rejecting non-examining reviews, he accurately summarized the available evidence. (*Id.* at 475-79.) In addition, he proposed a method for evaluating Seals's complaints, comparing them across the files and looking to Dr. Shafer's testing results that indicated Seals was exaggerating. (*Id.* at 477.) This falls short of offering the sort of credibility assessment the Sixth Circuit has rejected from non-examiners. *Judge*, 710 F.3d

at 663; *Bennett*, 514 F.3d at 555-56. His conclusion from this analysis—particularly, from his observation that the overlap of Seals's self-reported somatic symptoms suggested that Seals's symptoms were not entirely psychiatric—was not necessarily adverse to Seals but left open the possibility that, given Seals's physical complaints, the symptoms were real and had a physical origin. Moreover, the Sixth Circuit suggested in *Bennett* that it was only concerned about non-examiner credibility assessments "when the files do not state that there is reason to doubt the applicant's credibility." *Bennett*, 514 F.3d at 555-56. Dr. Schafer's testing offered not just a "reason to doubt the applicant's credibility," but one with objective pedigree.

The rest of Dr. Sugerman's analysis is convincing and Seals's arguments do little to dent it. Dr. Sugerman explained his conclusion that there was a "relative lack of objective data," pointing out the absence of diagnostically significant symptoms and manifestations, such as frequent hospitalizations. (*Id.* at 478.) He said the PTSD had not resulted in "dissociative episodes or rage outbursts" (*id.*), though this may have overlooked Seals's reports of outbursts against his boss, which were noted in Dr. Schafer's report. (*Id.* at 562.) Those outbursts, however, do not seem to have included the sort of rage-like symptoms Dr. Sugerman meant, and he was clearly aware of Dr. Schafer's report, citing its findings. There is not enough information about his behavior towards his boss to believe it was symptomatic of PTSD. The only other possible "rage" episode was the vague story he told to Dr. Ingram about tapping on the window of another car, which had not let him pass. (*Id.* at 481.) Again, Dr. Sugerman thoroughly reviewed those records, thus his conclusion did not result from ignoring evidence. *Cf. Calvert*, 409 F.3d at 296-97; *Kalish*, 419 F.3d at 508-11; *Scofield*, 2013 WL 5442778, at *5-8.

Further, Dr. Sugerman was correct to rely on the conservative treatment Seals received, consisting of only monthly check-up appointments with Dr. Ingram. (*Id.* at 479.) Even after Seals

began reporting fleeting thoughts of suicide, Dr. Sugerman observed that more intensive treatment was not recommended. And as noted, Seals never complied with the full recommended treatment in the first place, failing to ever attend therapy. While inconstant adherence to proposed treatment can result from the depression itself,[14] Seals did not comply at all with the recommendations of two doctors. Even if his non-compliance could have been symptomatic of his disorders, Dr. Sugerman's analysis to the contrary was not unreasonable, particularly as Seals did seek out other treatments and consistently attended sessions with Dr. Ingram. Dr. Sugerman was therefore justified in interpreting the minimal treatment as a sign that the depression was not disabling. Because the record lacked evidence and Dr. Sugerman provided a thorough explanation, Liberty did not need to order an examination in this scenario even if such examinations are particularly useful when addressing psychiatric issues. *Cf. James I*, 984 F. Supp. 2d at 737.

Seals's unfortunate hospitalization in March 2013 does not change the analysis. Dr. Sugerman had earlier suggested that hospitalizations could indicate more severe symptoms (*id.* at 478), and consistent with that observation he acknowledged that the March episode might signify that greater restrictions were warranted in the weeks after. (*Id.* at 471.) He properly rejected Dr. Ingram's argument, expressed during their conversation, that the limitations were in place earlier as evidenced by Seals's general work history juxtaposed against his unsuccessful work attempt

---

[14] This point has been noted in the Social Security disability context. *See **Error! Main Document Only.**Minor v. Comm'r of Soc. Sec*., 513 F. App'x 417, 436 (6th Cir. 2013)(**Error! Main Document Only.**"[A] claimant's failure to seek mental health treatment is not probative of whether a mental impairment exists and should not be determinative in a credibility assessment."); **Error! Main Document Only.**Martinez v. Astrue, 630 F.3d 693, 697 (7th Cir. 2011) ("[P]eople with serious psychiatric problems are often incapable of taking their prescribed medications consistently."); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself."); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("Here, although the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment . . . nor did she note [his] . . . inability to pay . . . .").

in 2012. (*Id.*) The fact remained, Dr. Sugerman declared, that the objective evidence from before March was too meager.

Whether Seals was disabled or not in the weeks after his March 2013 hospitalization, or even what his limitations might have been at that time, Dr. Sugerman did not say, though he observed that Seals had definite functional limitations for approximately two weeks after the event. (*Id.* at 471.) Liberty's denial letter took this to mean that Seals was disabled during that two-week period. (*Id.* at 90.) Disability beginning at that point, however, was irrelevant to his claim. (Doc. 19 at 3-4.) The Policy required him to prove disability throughout the Elimination Period, which Liberty dated from September 27, 2012 to March 27, 2013. (*Id.*) Thus even the broadest implication arising from the hospitalization—that it signified an extended period of subsequent disability—was insufficient to garner benefits under the Policy.

At this point, another of Seals's criticisms of Dr. Sugerman become relevant: The review was unduly fixated on the lack of change in Seals's condition after September 2012. (Doc. 12 at 16.) Dr. Sugerman's initial report indeed noted that Seals's depression did "not appear more severe beyond 9/17/12 than before 9/17/12." (*Id.* at 478.) Seals contends that the date is irrelevant, adding a causal connotation to the statement so that Dr. Sugerman is read to argue Seals was not disabled after the date because he was not disabled before it. (Doc. 13 at 16; Doc. 16 at Pg ID 805.) But the actual sentence does not imply such a crude causal mechanism. Instead, Dr. Sugerman implies that there is not enough evidence before September, when Seals still worked, to find disability and no subsequent evidence reveals a change in his condition. In any case, Dr. Sugerman's analysis did not hinge on this statement, but rather relied on a close analysis of the evidence. And, contrary to Seal's arguments, September 27, 2012 is relevant because it is the alleged disability onset date. (Doc. 10 at 79, 475; Doc. 12 at 6.)

Seals's final sally at the review aims to discredit it because Dr. Sugerman failed to exhibit familiarity with the job position's requirements. (Doc. 13 at 17; Doc. 16 at Pg ID 804; Doc. 18 at Pg ID 833.) If true, it could diminish the cogency of the review's analysis. *See McDonald*, 347 F.3d at 170-71; *Judge*, 710 F.3d at 658-59; *Kalish*, 419 F.3d at 506. However, the very first page of the report states that Dr. Sugerman reviewed the job description and occupational demands. (*Id.* at 475.) There is no indication he misapplied this standard or used a different one. Nothing suggests, for example, that he simply guessed that Seals "might be able to return to work under certain limited circumstances." *McDonald*, 347 F.3d at 170-71. Instead, he initially found that "the data does not confirm an inability to function based on a psychiatric condition" (*id.* at 479), and in light of later evidence added that limitations might apply only in March 2013. (*Id.* at 471.) The analysis would come to the same conclusion even if he somehow mistook the job description. By saying Seals had no psychiatric limitations he implied, if not forthrightly asserted, that Seals could perform any tasks unimpeded by his mental condition. It is tautological to note that a condition that does not impose any limitations does not limit a person from any particular duties, regardless of what those duties might be. But in any event, Dr. Sugerman sufficiently considered the job description.

Seals does not seem to take direct issue with either nurse Penny's or Dr. Lewis's reviews, levying no specific arguments against either. He instead relies on the bare fact that they did not examine him, the treating physicians found limitations,[15] and a conclusory claim that the consultant's "are bias [sic] in their conclusions." (Doc. 12 at 16-19.) As discussed above, mere claims of bias are insufficient; there must be some hint that the structural conflict skewed their

---

[15] Seals twice refers to the "six different doctors" who placed him on "work restrictions" (Doc. 12 at 17), and found he "was disabled and unable to return to work due to his depression and severe back pain." (*Id.* at 18.) He never names these six doctors. The only sources with actual treatment notes in the record have been addressed above.

opinions. *See Kalish*, 419 F.3d at 508; *Agin*, 2006 WL 1722228, at *14. As Liberty argues, Seals does not offer such an argument. (Doc. 19 at 2.) And the Sixth Circuit has distinguished between the potential bias of an administrator's employee and the peer reviews offered by the independent experts here. *Kalish*, 419 F.3d at 507.

More importantly, he has failed to show that any of the considerations laid out in the case law merit overturning this file-only review. Treating sources do not command automatic deference, *Nord*, 538 U.S. at 834, and Seals has not shown that his sources were particularly probative. Quite the opposite, in fact. *Cf. James I*, 984 F. Supp. 2d at 737. Nor does he argue that Liberty disregarded these opinions without offering an explanation. *See Gillespie*, 567 F. App'x at 353; *Elliot*, 473 F.3d at 620. The explanation they did offer again and again—the lack of sufficient objective evidence (Doc. 10 at 73, 351, 368-69, 477-79, 609)—has been found by numerous courts to constitute a valid rationale for rejecting treating source opinions. *See Morris*, 399 F. App'x at 986-87; *Curry*, 400 F. App'x at 59; *Rice-Peterson*, 2013 WL 1250457, at *9. Further, as noted above, many of the treating sources who offered opinions on Seals's psychiatric state were outside their areas of expertise. *See Simpson*, 2007 WL 2050428, at *4. Liberty could rely on the reviews here because they were extensive and provided analysis to explain their conclusions. *See e.g.*, *Breland*, 2015 WL 1132948, at *11-13; *Serra*, 2009 WL 2222856, at *3-4. Seals has not shown that any of the concerns expressed by courts rejecting file-only reviews are present in this case. *Cf. Calvert*, 409 F.3d at 296-97. Without a sufficient reason to reject the non-examining medical opinions, they serve as acceptable evidence. *See Elliot*, 473 F.3d at 620-21; *Calvert*, 409 F.3d at 295.

Further, the reviews, and Liberty's final decision, are supported by a preponderance of the evidence. One of the critical reports in the records is the visit to Dow's medical provider in

September 2012, when he was allowed to leave work. (Doc. 10 at 298-99.) This is the fulcrum of the medical record, after which he scuppered his attempted return to work and initiated his disability claim. It would seem, then, that the reasons given during this visit would be particularly probative of his limitations. Long after the visit, Seals claimed that he was sent home because he "was working from my office floor due to pain" and because his medications could affect his decision-making. (*Id.* at 344) His physicians subsequently repeated this explanation. (*Id.* at 322.)

This is not entirely accurate. During the visit, the objective portion of the notes did not flag any issues: "No deficits noted in speech or demeanor. Appears to be functioning normally. No further exam done today." (*Id.* at 298.) So when they decided that he would "remain off of work," they did so without the benefit of an examination and, what the nurse did observe was unremarkable. (*Id.* at 299.) Moreover, while Seals described his increasing pain, the reason given in the notes for sending him home was the effect his pain medication might have on his mental functioning. (*Id.* at 298-99.) Yet Seals did not seem concerned about these effects. He said that he "does have occasional drowsiness from the medications, but has been working and driving." (*Id.* at 298.) In fact, he felt safe to drive home that day, as he had not taken any medications. (*Id.* at 299.) The physical limitations discussed during the session did not appear insurmountable. His work station adjusted from sitting to standing, and he could walk, stretch, and lay down when necessary. (*Id.* at 298.) Notably, just the prior week he had traveled without difficulty. (*Id.*) And the planned leave from work was to be temporary and limited: He was to "remain off of work until he can see his doctor to either adjust his medications to non-sedating medications, or provide us with a statement that they are not affecting his ability to function." (*Id.* at 299.) Thus, the overriding concern was his drowsiness at work, which was the only side effect of the

medication that he mentioned. Seals confirmed this to Dr. Nahata, telling him he was "excused form work as [he was] taking Percocet for pain." (*Id.* at 583.) As an indication that the time off was temporary, the last line states that they would "discuss" his "ability to travel to Philadelphia" for a work conference occurring the following week. (*Id.* at 299)

There is thus no indication from this file that he left work as a direct result of debilitating pain or cognitive difficulties. When he called in with an update nearly two weeks later, on September 28—after the work conference had passed—he told Dow that he would remain "off work indefinitely until they can get his pain under control." (*Id.* at 301.) Yet at the intervening doctor's visit on September 26, the physical examination did not uncover any severe pain or indication that the medications affected his functioning. (*Id.* at 583-84.) During the visit, he had only mild spasm and tenderness in his cervical spine, mild tenderness in his shoulders, and spasm and tenderness in his lumber spine. (*Id.* at 583.) His range of motion was "mostly within functional limits," with only "slight[]" limitations in his lumbar spine and "slight[]" pain in his cervical spine. (*Id.*) Moreover, his strength was normal throughout, and the recent diagnostic testing showed only a "small" disc protrusion that resulted in "very mild" stenosis. (*Id.*) Despite Seals's complaints that the pain had radiated, Dr. Nahata found no evidence of this during the examination. (*Id.*) The notes make no mention one way or another about whether he could return to work, and Dr. Nahata did not feel he needed to see Seals sooner than in three months. (*Id.*)

The notes from the September visits are characteristic of the record as a whole. None of the evidence submitted shows testing results or examination notes that indicate any significant or debilitating limitations. (*Id.* at 129, 331-35, 543-45, 547, 550-51, 555-57, 581-83, 587.) He was consistently within normal bounds for physical functioning (*id.*) and any deficiencies were "slight[]" or "mild." (*Id.* at 583.) For example, the MRIs Dr. Udhen reviewed showed nothing

other than mild issues, and the most recent indicated some improvement. (*Id.* at 334-35.) Dr. Udhen proposed bending, lifting, and carrying limitations, finding that Seals could perform part-time sedentary work. (*Id.* at 336.) But he does not appear to have compared these to Seals's job requirements, which were largely sedentary. Nonetheless, these proposals from Dr. Udhen's limited treatment of Seals do not prove disability, particularly in light of the examination findings, which were normal despite some pain, and the MRI results. A few weeks later, even the pain had drastically decreased—by 70 to 80 percent—after facet block injections. (*Id.* at 337.)

The subjective complaints do constitute evidence that Liberty was obligated to consider under the Policy, *see James I*, 984 F. Supp. 2d at 739, but nothing indicates that Liberty ignored the subjective evidence and nothing in the Policy or in the case law required Liberty to credit it over contrary objective evidence. As for the psychiatric evidence, which mostly consisted of self-reported complaints, the pre-March 2013 record does not contain any showing of disabling symptoms. As Dr. Sugerman pointed out, Seals had no hospitalizations during this period, did not seek psychotherapy as recommended, and was not prescribed an intensive treatment regimen. (Doc. 10 at 478.) Thus, regardless of the possible downturn in March 2013, Seals has not proven his disability throughout the Elimination Period as the Policy requires. And the most rigorous cognitive testing in the record concluded that his cognitive issues did not result in limitations. Thus, I suggest that the preponderance of the evidence supports Liberty's decision.

## IV.   <u>Conclusion</u>

For the reasons discussed above, I suggest that Liberty made the correct decision to deny Seals long-term disability benefits. Consequently, I recommend DENYING Plaintiff's motion

(Doc. 13) and GRANTING Defendant's motion (Doc. 12). Because of this recommendation, I need not address the parties' arguments concerning the appropriate benefit award.[16]

## V. __REVIEW__

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to

---

[16] Liberty argues that, if the Court overturned the denial and awarded benefits, the award should be limited to the 24 months following the Elimination Period, as laid out in the Policy. (Doc. 12 at 24.) After this period, a different disability standard applies—that the applicant cannot perform "any occupation"—and since this standard was never considered, Liberty contends it would be inappropriate to award benefits for any time in which it applies. (*Id.* at 23-25.) Seals, wary of a remand to Liberty for review under the "any occupation" standard—"Liberty has already proven that they are incapable of providing Mr. Seals with an unbiased, full and fair review"—asks the Court to "make additional findings for the ongoing 'any occupation' standard because Mr. Seals deserves the benefit of an untainted review process which the Defendant has already demonstrated cannot [sic] provide." (Doc. 18 at Pg Id 835.)

which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  April 29, 2015                          S/ PATRICIA T. MORRIS
                                               Patricia T. Morris
                                               United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: April 29, 2015                          By s/Kristen Krawczyk
                                               Case Manager to Magistrate Judge Morris